**In re ANCHOR RESOLUTION CORP., et al., Debtors.**

**ANCHOR RESOLUTION CORP., et al., Plaintiffs,**

v.

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, National Association, as Collateral Agent, Defendant.**

**Bankruptcy Nos. 96–1434, 96–1516(PJW). Adversary No. A–97–87.**

United States Bankruptcy Court, D. Delaware.

April 9, 1998.

**332**

Joanne B. Wills, Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Wilmington, DE, Counsel to the Official Committee of Unsecured Creditors of Anchor Resolution Corp.

Edward S. Weisfelner, Steven E. Greenbaum, Andrew Dash, Berlack, Israels & Liberman, L.L.P., New York, Special Litigation Counsel to Anchor Resolution Corp. and the Official Committee of Unsecured Creditors of Anchor Resolution Corp.

Thomas L. Ambro, Daniel J. DeFranceschi, Richards, Layton & Finger, Wilmington, DE, Evan D. Flaschen, Jeffrey L. Williams, Thomas H. Day, Hebb & Gitlin, Hartford, CT, Counsel to the Collateral Agent.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court are the cross-motions for judgment on the pleadings filed by Anchor Resolution Corp. (f/k/a Anchor Glass Container Corp.) (the "Debtor"), the Official Committee of Unsecured Creditors of Anchor Resolution Corp. (the "Committee"), and intervenor The Chase Manhattan Bank, as Indenture Trustee, ("Chase"; together with the Debtor and the Committee, the "Plaintiffs") and defendant State Street Bank and Trust Company of Connecticut, National Association (the "Collateral Agent") with respect to Claims Four, Five, and Six of the complaints filed by the Plaintiffs seeking to disallow, reduce, or subordinate a make-whole claim of the Collateral Agent.

The Court shall grant a motion for judgment on the pleadings filed pursuant to Federal Rule of Bankruptcy Procedure 7012(c) where the movant has clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *See Institute For Scientific Info. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir.1991)(quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir.1988)). In considering the merits of a Rule 7012(c) motion, the Court views the pleadings in the light most favorable to and draws all inferences in favor of the nonmoving parties. *See, e.g., Revis v. Slocomb Indus.*, 765 F.Supp. 1212, 1213 (D.Del.1991)(quoting *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir.1989)). The pleadings here consist of the complaints, the answers of the Collateral Agent, the addenda to the answers, and an amended proof of claim which updates a portion of the addenda.

The make-whole claim arises from two prepetition loan agreements between the Collateral Agent and the Debtor. By their complaints, the Plaintiffs assert that the amount of the make-whole claim is only approximately $1.5 million, and not the $15,668,324 as asserted by the Collateral Agent and, in the alternative, that the Collateral Agent has waived its make-whole claim of $15,668,324. The Plaintiffs further assert that any allowed amount should be subordinated to the claims of unsecured creditors.

For the reasons stated below, I will grant the Collateral Agent's motion and deny the motions of the Plaintiffs.

## JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b). Furthermore, this proceeding is a core proceeding that concerns the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B). The case is before the Court pursuant to the Order of the United States District Court for the District of Delaware, dated June 13, 1994, referring cases under Title 11 and all proceedings arising under Title 11 to bankruptcy judges for this District.

## FACTS

In June 1991, the Debtor entered into a note purchase agreement (the "NPA") with various purchasers of notes. Pursuant to the NPA, the Debtor issued to the purchasers $38 million in aggregate original principal amount of Floating Rate Series A Senior Secured Notes due July 15, 1998, $202 million in aggregate original principal amount of 9.91% Series B Senior Secured Notes due July 15, 1999 (the "Series B Notes"), and $10 million in aggregate original principal amount of Floating Rate Series C Senior Secured Notes due July 15, 1999.

At issue here is the NPA with respect to the Series B Notes. The Debtor granted a first lien security interest in substantially all of its real and personal property to the Collateral Agent for its own benefit and for the benefit of the Series B Noteholders. The NPA includes a provision that entitles the holders of those notes to a make-whole amount in the event of a prepayment of principal or an event of default. Section 11.1 of the NPA defines events of default. One such event is defined as "[the commencement of] a voluntary case under any chapter of the Federal Bankruptcy Code." NPA § 11.1(j).

The NPA includes a formula for computing the make-whole amount. The NPA's formula for and entitlement to a make-whole amount were designed to compensate the Series B Noteholders in the event the Debtor paid amounts due under the NPA prior to their scheduled maturity and thus deprived the Series B Noteholders of their full bargained-for investment. The NPA formula for calculating the make-whole amount is essentially a function of interest rates prevailing as of the prepayment or default date versus the 9.91% contract rate.

In and before January 1996, the Debtor was experiencing substantial and mounting operating losses. To provide the Debtor with additional financing, Foothill Capital Corp. and other financial institutions (the "Foothill Group") agreed to loan $130 million to the Debtor. The Foothill Group required senior liens to secure this loan, and all but

two of the Series B Noteholders consented to these senior liens. Because not all the Series B Noteholders consented, it is necessary to distinguish in this opinion between the consenting Series B Noteholders and the nonconsenting Series B Noteholders.

In January 1996, in connection with the new loan, the consenting Series B Noteholders and the Debtor executed a twenty-nine-page note restructuring agreement (the "NRA"). The NRA defines a restructuring period and a termination date for the restructuring period. In consideration for the consent of the Series B Noteholders to the senior liens of the Foothill Group, the NRA required a partial prepayment of $64,640,000 towards the balance then due on the notes. Furthermore, pursuant to the terms of the NRA, the Debtor paid the Series B Noteholders a 1.75% restructuring fee of about $3.4 million and agreed to pay interest monthly rather than quarterly during the restructuring period. See NRA § 5.6(b).

The consenting noteholders further agreed in the NRA that under certain conditions, the Debtor could prepay the Series B Notes during the restructuring period and pay an adjusted make-whole amount in lieu of the full make-whole amount provided for in the NPA. See NRA § 2.3. The NRA defines the adjusted make-whole amount, in relevant part, as 1% of the total principal amount that was prepaid during the restructuring period, and this formula results in an Adjusted Make–Whole Amount that was substantially less than the Full Make–Whole Amount.[1]

Pursuant to a provision of the NRA, the make-whole obligation triggered by the $64,-640,000 prepayment was deferred to the end of the restructuring period. In addition to the $64,640,000 prepayment when the NRA was executed, between January 1996 and the date of these Chapter 11 filings, the Debtor made five other prepayments on the Series B Notes. These payments were triggered by miscellaneous asset sales. The make-whole obligations resulting from these prepayments were likewise deferred to the end of the restructuring period.[2]

---

1. Both amounts are specified below.

2. The Debtor paid to the nonconsenting Series B Noteholders the make-whole amounts that arose

The Debtor and Anchor Recycling Corp. filed their respective voluntary petitions under Chapter 11 of the Bankruptcy Code on September 13, 1996 (the "Petition Date"). Their second amended joint Chapter 11 liquidating plan of reorganization was confirmed on November 25, 1997. On the Petition Date, this Court entered an interim order under Code § 364 [3] approving monthly interest payments to the consenting noteholders at the contract rate of 9.91%. On November 15, 1996, this Court entered a final order approving financing and approving the monthly interest payments at the contract rate. The final order provides that any noteholder accepting the interest payments waived its right to assert that it was entitled to a default rate of interest.[4] The Debtor continued to make such payments on a monthly basis through the effective date of its plan of reorganization.

In January 1997, the Collateral Agent, on behalf of itself and the Series B Noteholders, filed a proof of claim for $143,875,091. Of this amount, the Series B Noteholders asserted that $15,668,324 was due as the make-whole claim (the "Full Make–Whole Amount"). The proof of claim took the position that the filing of the Chapter 11 petition was an event of default, that the restructuring period had terminated, and that all the previously conditionally deferred make-whole payments were now due.

The claim detailed the Full Make–Whole Amount allegedly due under the applicable provisions of the NPA and the NRA. The Full Make–Whole Amount of $15,668,324 was the sum of a prepetition make-whole amount of $6,354,716 and a postpetition make-whole amount of $9,313,608. The $6,354,716 amount was the sum of the six deferred make-whole amounts on consenting Series B Notes that resulted from the six prepayments made between January 1996 and September 1996. According to the claim, the

unpaid postpetition make-whole amount of $9,313,608 became due pursuant to the final paragraph of Section 11.1 of the NPA. The final paragraph of Section 11.1 of the NPA states:

> If the maturity of any Series B Notes shall be accelerated under this § 11.1 by reason of the occurrence of an Event of Default, there shall become due and payable (and the Company will pay), as compensation to the holders of such Notes for the loss of their investment opportunity and not as a penalty, a premium equal to the Make–Whole Amount.

The proof of claim applied the make-whole formula of the NPA to the unpaid balance to arrive at a postpetition make-whole claim of $9,313,608. The Plaintiffs dispute none of the calculations in the proof of claim. The proof also claimed postpetition interest on both the prepetition and postpetition make-whole amounts.[5] As will be discussed below, this proof was later amended.

According to the Debtor, pursuant to the adjusted make-whole provision of the NRA, the prepayments and the default event produces a make-whole obligation of approximately $1.5 million (the "Adjusted Make–Whole Amount").

In December 1996, the Debtor sold substantially all of its assets to Owens–Brockaway Glass Container Inc. and Consumers Packaging, Inc. The Collateral Agent's liens for the benefit of the noteholders attached to the proceeds of this sale. In March 1997, the Debtor made a principal payment of $89,243,647 on the Series B Notes.

In June 1997, the Debtor and the Committee initiated this adversary proceeding against the Collateral Agent. Subsequently, Chase was granted leave to intervene as a plaintiff and asserts essentially the same complaint. While the complaints contain six

---

as a result of the prepayments to those noteholders.

**3.** 11 U.S.C. §§ 101 *et seq.* are herein referred to as "Code § \_\_\_\_."

**4.** The final order further provides that a noteholder could opt not to receive interest payments, but preserve the argument that it was

entitled to a default rate of interest; however, the record does not indicate whether any noteholder elected this option.

**5.** For the purposes of this opinion, the Court assumes without deciding that the value of the collateral exceeds the amount of the claims of the Collateral Agent.

claims for relief, only Claims Four, Five, and Six are at issue in these cross-motions for judgment on the pleadings. Claim Four seeks declaratory relief that the make-whole claim of the Series B Noteholders is for approximately $1.5 million, and not for $15,-668,324. Claim Four asserts that the NRA is an executory contract and that the event of default clause defined in Section 11.1(j) of the NPA is an *ipso facto* provision that is unenforceable pursuant to Code § 365(e)(1)(B). Claim Four also seeks to disallow the $15,-668,324 obligation on the basis that the right to the reduced obligation of $1.5 million is property of the estate pursuant to Code § 541(c). Claim Five asserts that the Series B Noteholders have waived, or should be estopped from asserting, any claim in excess of the Adjusted Make–Whole Amount. This waiver/estoppel theory is based on certain "benefits" allegedly received by the Series B Noteholders pursuant to the NRA. Claim Six asserts that in the event any or all of the Full Make–Whole Amount is allowed, it should be viewed as a penalty and therefore it should be equitably subordinated to the prior recovery in full on the allowed claims of all the other creditors of the Debtor's estate.

In addition to the issues underlying Claims Four, Five, and Six, this opinion also addresses an argument raised by the Plaintiffs not in the complaints but in the motion papers—that the Full Make–Whole Amount is not "reasonable" as contemplated by Code § 506(b).

In January 1988, the Collateral Agent filed an amended proof of claim with respect to the Series B Notes. The amended proof of claim supersedes the prior proof of claim filed on behalf of the Series B Noteholders. The amended claim reduces the principal amount claimed to $57,493,043.81 and maintains that the make-whole component of the amended claim was $15,668,324.

Specifically, the amended claim reiterates that the unpaid postpetition make-whole amount is $9,313,608. The amended proof acknowledges, however, that if this Court determined that the monthly interest payments should be applied in respect of interest accruing on the notes during the postpetition period, then as an arithmetical matter, the

unpaid postpetition make-whole amount would be reduced to $7,600,860. This reduced postpetition amount is the sum of a premium of $5,472,805 arising as of March 19, 1997, (the date of the Debtor's principal payment of approximately $89 million) and $2,128,055 that became due upon the plan's effective date of December 11, 1997. Under this formulation, the Series B Noteholders' make-whole claim equals $13,955,576 (the "Amended Make–Whole Amount").

## DISCUSSION

The Plaintiffs and the Collateral Agent agree that there is no issue of material fact; however, they disagree on the construction of the NRA and the application of Code §§ 365(e)(1)(B), 506(b), 510, and 541(c). The resolution of these disputes determines (1) whether the Collateral Agent is entitled to the Full Make–Whole Amount or only the Adjusted Make–Whole Amount and (2) the treatment of the make-whole amount.

### 1. Claim Four

In reference to Claim Four, the Plaintiffs assert that pursuant to the NRA, the Collateral Agent is only entitled to $1.5 million. The Plaintiffs' first argument relies upon Section 2.3 of the NRA. In pertinent part, Section 2.3 states:

Notwithstanding any provision herein or in the Note Purchase Agreement to the contrary, *during* the Restructuring Period each Signing Noteholder acknowledges and agrees for itself . . . as follows:

(a) . . . any Make–Whole amount . . . that would otherwise be payable to such Signing Noteholder . . . shall be *deferred* (without interest) *until,* and shall not be due and payable by the Company until, the Termination Date, at which time all such deferred Make–Whole Amounts and Breakage Amounts . . . shall be payable by the Company *in full* as secured obligations . . . of the Company to the Noteholders (and, if not immediately paid, shall accrue interest thereafter at the same rate applicable to the Notes at such time);

(b) upon the occurrence of a Change in Control or other event pursuant to which the Company proposes or is required to

prepay in full all of the Company's Indebtedness to the Noteholders in respect of the Financing Documents, unless a Default, Event of Default or Restructuring Event of Default exists (and has not been waived) as of the Change of Control Prepayment Date or Optional Prepayment Date (as the case may be), (i) the Breakage Amounts (if any) payable on the Series A Notes and Series C Notes on the relevant Change in Control Prepayment Date or Optional Prepayment Date (as the case may be) shall be due and payable in full, (ii) the portion of the Deferred Amounts consisting of Make–Whole Amounts shall be deemed to be equal to, and shall be due and payable in the amount of, the Adjusted Make–Whole Amounts calculated as of the date or dates such Deferred Amounts were originally calculated, and (iii) the Make–Whole Amount payable on the Series B Notes held by the Signing Noteholders on the relevant Change in Control Prepayment Date or Optional Prepayment Date (as the case may be) shall be deemed to be equal to, and shall be due and payable in the amount of, the Adjusted Make–Whole Amount as of such Change in Control Prepayment Date or Optional Prepayment Date (as the case may be);

(c) *upon* the Company's *payment* to each Signing Noteholder that is a holder of Series B Notes of the Adjusted Make–Whole Amounts required to be paid to it in accordance with Section 2.3(b) hereof and all other Indebtedness of the Company to such Signing Noteholder in respect of the Financing Documents (but not otherwise), unless a Default, Event of Default or Restructuring Event of Default exists (and has not been waived) as of such time, such Signing Noteholder shall be deemed to have waived, forgiven and discharged all other obligations of the Company to pay Make–Whole Amounts to it including, without limitation, the Deferred Amounts in excess of the relevant Adjusted Make–Whole Amounts.

NRA § 2.3(a)-(c) (emphasis added).

The Plaintiffs argue on the basis of this language in the NRA, the allegations of the amended proof of claim, and applicable bankruptcy law that the Series B Noteholders agreed to be paid only the Adjusted Make–Whole Amount. The Series B Noteholders disagree with the Plaintiffs as to the proper interpretation of the NRA and the application of applicable bankruptcy law, and they further rely upon Section 2.7 of the NRA in support of their position. Section 2.7 of the NRA states:

Except as expressly provided herein . . ., all of the terms and provisions of the Note Purchase Agreement (including, without limitation, the mandatory prepayment provisions to the extent not expressly overridden hereby), the Notes and the Security Documents shall remain in full force and effect, and nothing in this Agreement shall waive . . . any right, power or remedy of the Noteholders under the Note Purchase Agreement . . . .

As I read Section 2.3 of the NRA, the NRA defers the obligation to pay the Full Make–Whole Amount and creates a conditional right for the Debtor to pay in lieu thereof the Adjusted Make–Whole Amount. This right is available only: (1) during the restructuring period; (2) in the absence of a default, event of default, and restructuring event of default that was not waived; and (3) upon payment of the Adjusted Make–Whole Amount and all other indebtedness.

The proof of claim alleges as an event of default the filing of the Debtor's bankruptcy petition, and indeed, this event is defined in the NPA as a default. *See* NPA § 11.1(j). Section 6.1 of the NRA defines a restructuring event of default to include a bankruptcy petition filing. The Series B Noteholders conclude that a restructuring event of default occurred within the meaning of Section 2.3(b)-(c) of the NRA and that, therefore, the conditions precedent to the Debtor's right to pay only the Adjusted Make–Whole Amount are not satisfied.

■ The Plaintiffs respond that this type of default is unenforceable pursuant to Code § 365(e)(1)(B), that the conditions contained in Section 2.3(b)-(c) of the NRA are still satisfied, and that thus the Series B Noteholders are not entitled to the Full Make–Whole Amount.

Code § 365(e)(1)(B) states:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

. . .

(B) the commencement of a case under this title.

As a threshold matter, the Plaintiffs' reliance upon this Code section depends upon whether the NRA is an executory contract. The Series B Noteholders argue that the NRA is not executory.

▪ An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that failure of either to complete performance would constitute a material breach excusing performance of the other. *Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3d Cir.1995). The Plaintiffs argue, as they must, that the Series B Noteholders had continuing obligations. The Plaintiffs first argue that Section 9.2 of the NRA imposed upon the Series B Noteholders a continuing obligation to maintain the confidentiality of certain information. The Series B Noteholders rejoin that a violation of the confidentiality agreement would not constitute a material breach excusing the Debtor from its obligations under the NRA. The Debtor has not responded to this argument, and I agree with the Collateral Agent that the obligation created by Section 9.2 of the NRA is not the type that would make the NRA executory.

The Plaintiffs also argue that the Series B Noteholders agreed to defer or waive make-whole and breakage amounts as discussed in Section 2.3 of the NRA and that such a going-forward duty of forbearance renders the contract executory. However, I agree with the Series B Noteholders that the NRA does not create any obligation to forbear. The NRA is a workout agreement and conditionally takes away rights the Series B Noteholders possessed under the NPA to pursue certain remedies.

The arguments the Plaintiffs raise here were addressed in *Steele v. Boutiette (In re Boutiette)*, 168 B.R. 474, 480 (Bankr.D.Mass. 1994). In that case, the court was asked to rule upon whether a prepetition workout agreement with a bank was an executory contract. The court reasoned that a workout agreement may be an executory contract if the lender has affirmative obligations arising out of that agreement, the performance of which could be excused by the debtor's nonpayment. The *In re Boutiette* court found no such obligations and ruled that the agreement was not executory.

As the NRA does not contain any material obligations that remain to be performed either by the Series B Noteholders or by the Debtor,[6] it does not constitute an executory contract as a matter of law. The Debtor's filing of its Chapter 11 petition created a restructuring event of default. Therefore, the Debtor's argument that all the conditions contained in Section 2 of the NRA were satisfied is without merit.

▪ Alternatively, the Plaintiffs argue that the right to pay the Series B Noteholders only the Adjusted Make–Whole Amount, and not the Full Make–Whole Amount, is an interest in property that, upon the commencement of the Debtor's Chapter 11 case, became property of the estate.

The Plaintiffs rely upon Code § 541(c)(1)(B), which states:

[A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

. . .

(B) that is conditioned upon the . . . commencement of a case under this title, . . . and that effects . . . a forfeiture,

---

**6.** The Debtor's obligations to pay principal, interest, and the make-whole claim arise under the NPA, not the NRA.

modification, or termination of the debtor's interest in property.

The Plaintiffs conclude that the "interest of the debtor" to pay only the Adjusted Make–Whole Amount became property of the estate. The Plaintiffs articulate this property interest as follows:

> The Debtor possessed—and possesses—a contractual property right under the NRA to enforce the Adjusted Make–Whole Claim. The filing of Anchor's Chapter 11 case did not abrogate the estate's rights under the NRA or, for that matter, any other contract to which the estate was a party. In other words, Section 541(c) insures that the Debtor's valuable right to receive the benefit of the Adjusted Make–Whole Claim cannot be lost due to the filing of this Chapter 11 case.

Doc. # 24, at 23.

The Series B Noteholders dispute that the right to pay only the Adjusted Make–Whole Amount is a property interest. They argue that the possibility of a discount on the Full Make–Whole Amount was available only during the restructuring period, which period terminated by definition upon the commencement of the Debtor's Chapter 11 case so that the possibility of the discount never materialized. Accordingly, the nonmaterialization of a possible discount should not be considered to be the forfeiture of an "interest in property," and therefore Bankruptcy Code § 541(c) does not apply. While I agree with this argument, the Series B Noteholders set out yet a better one, as follows.

The Series B Noteholders argue that even if the Adjusted Make–Whole Amount somehow involves a "property interest" to which Code § 541(c) applies, it is axiomatic that a debtor's estate acquires property interests *cum onere*. *See* 5 Collier on Bankruptcy ¶ 541.04, at 541–11 (Lawrence P. King ed. 15th ed. rev. 1997)("To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate ....") Accordingly, even if the prospective and conditional right to reduce the make-whole claim to the discounted Adjusted Make–Whole Amount did become property of Anchor's estate due to the operation of Code § 541(c), it did so subject to the remaining terms and conditions of the NRA. One or more of the other terms and conditions were not satisfied and, indeed, are not capable of being satisfied by the Debtor.

For example, the Series B Noteholders point out that the restructuring period is defined to terminate upon the occurrence of a "Change in Control Prepayment Date." NRA § 1.1, at 3, 4. The NPA defines a "Change in Control" to include a sale of "all or substantially all of the assets of the Company," NPA § 7.6(d), and a "Change in Control Prepayment Date" as occurring shortly after the occurrence of a Change in Control, *id.* § 7.6(a). The Plaintiffs have not addressed this argument of the Series B Noteholders in their briefing, and I agree that the December 1996 sale independently terminated the restructuring period. Thus, any property interest of the Debtor to pay only the Adjusted Make–Whole Amount was also terminated.

The Series B Noteholders also point out that another condition to any right of the Debtor to pay only the Adjusted Make–Whole Amount is that the Debtor pay the Series B Noteholders in full upon the occurrence of a change in control prepayment date. The Plaintiffs do not dispute that this payment has not been made.

For these reasons, assuming that the Debtor had a property interest in the reduction of the Full Make–Whole Amount to the Adjusted Make–Whole Amount, I agree with the Series B Noteholders that the conditions to that right were not satisfied and that the restructuring period terminated independently of the Debtor's Chapter 11 filing.

## 2. Claim Five

In reference to Claim Five, the Plaintiffs argue that the Series B Noteholders have waived any entitlement to the make-whole claim and, alternatively, that the Series B Noteholders are estopped from asserting any claim that exceeds the Adjusted Make–Whole Amount. The doctrine of waiver requires the Plaintiffs to prove that the Series B Noteholders voluntarily and intentionally relinquished their known right to assert an enforceable claim for the Full Make–Whole

Amount. *See, e.g., Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 303 (2d Cir.1996)(applying New York law).[7]

In support of their waiver claim, the Plaintiffs rely upon the language of the NRA and upon conduct of the Series B Noteholders. The Plaintiffs refer to the language of Section 2.3(c) of the NRA. They argue that the Series B Noteholders waived their right to the Full Make–Whole Amount during the restructuring period and that this period never terminated by operation of bankruptcy law. The Series B Noteholders argue that the only fair reading of Sections 2.3(a)-(c) and 2.7 together is that the Full Make–Whole Amount was only deferred and that any waiver was conditional upon the Adjusted Make–Whole Amount being paid in accordance with the conditions of Section 2.3(b)-(c) of the NRA. The arguments of the Plaintiffs in this regard have previously been discussed and found to be without merit.

■ The Plaintiffs also rely on the conduct of the Series B Noteholders in accepting the prepayment of $64,640,000 and the restructuring fee to argue that the Series B Noteholders waived their right to the Full Make–Whole Amount. These facts merely point out consideration the Series B Noteholders received in exchange for consenting to the restructuring agreement and add nothing to support a theory of waiver. This dispute is fundamentally a contract law matter. The NRA reflects a mutual exchange of considerations between the Debtor and the Series B Noteholders. One of the considerations granted to the Debtor (the make-whole concession) is contingent on the existence of specified conditions. Those conditions were not satisfied, and cannot be satisfied, so that the contingent consideration never materialized. That is unfortunate for the Debtor, but I cannot rewrite the contract on the basis of some waiver concept that overrides basic contract law.

■ Finally, the Plaintiffs rely upon the acceptance by the Series B Noteholders of the monthly interest payments postpetition. The Plaintiffs argue that under the NRA, the Series B Noteholders were entitled to these payments only if the restructuring period had not been terminated. The Plaintiffs conclude, therefore, that the Series B Noteholders waived the right to argue that the restructuring period has terminated.

These payments were made to the Series B Noteholders as adequate protection payments under Code §§ 361, 363(e), and 364(d). (*See, e .g.,* Doc. # 9, Ex. 5 ¶ 31.) The Series B Noteholders expressly reserved their right to argue that the restructuring period had terminated despite their acceptance of the monthly payments. They did so in November 1996 in their objection to the motion of the Debtor to approve final postpetition financing, stating that the " 'Restructuring Period' has terminated in accordance with its terms," and that the Series B Noteholders' acceptance of the monthly payments should not be construed "as some sort of admission that the 'Restructuring Period' has somehow not terminated even though the express terms of the Noteholder Restructuring Agreement clearly provide otherwise." (Doc. # 10, Ex. 9 at 10–11.) The Plaintiffs have not proven waiver.

Under New York law, the party asserting estoppel must show that the party alleged to be estopped (1) engaged in conduct that amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts. In addition, the party alleging estoppel must also show with respect to itself (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in its position. *Readco, Inc.,* 81 F.3d at 301–302. The Plaintiffs have not even posited an argument in their briefing as to why the Series B Noteholders should be estopped from seeking the Full Make–Whole Amount. The Plaintiffs have presented nothing to support an estoppel defense.

For completeness of the record, with respect to the nonconsenting Series B Noteholders, the arguments raised in Claims Four and Five are not applicable and are without merit. Judgment on Claims Four

---

**7.** Both the NPA and the NRA contain a New York choice of law provision.

and Five is granted in favor of the nonconsenting Series B Noteholders.

### 3. The Section 506(b) Claim

The Plaintiffs' briefing raises the argument that the Full Make–Whole Amount of $15,668,324 should be disallowed as an unenforceable penalty or unreasonable fee not allowable under Code § 506(b). The Series B Noteholders point out, and I agree, that the 506(b) issue was not properly raised in the complaint. The Series B Noteholders argue, therefore, that the Court should not consider this issue. The Plaintiffs, however, have asked in a footnote in their briefing that this Court allow the complaints to be deemed amended pursuant to Bankruptcy Rule 7015. The Series B Noteholders respond that Court consideration of the Code § 506(b) argument would be prejudicial to the Series B Noteholders. I do not favor the practice of moving in a footnote in a brief to amend a complaint. I find, however, in light of the full briefing the Series B Noteholders have presented on the 506(b) issue and my rulings on the merits of the 506(b) issue, that there is no prejudice to the Series B Noteholders. The Plaintiffs' claim that the Full Make–Whole Amount should be disallowed pursuant to Code § 506(b) will be considered.

Code § 506(b) states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The Plaintiffs argue that the Full Make–Whole Amount is not "reasonable," assuming that the Series B Noteholders are entitled to secured status, and therefore should be disallowed pursuant to Code § 506(b).

The Plaintiffs concede that prepayment charges are enforceable under New York law. *See, e.g., United Merchants & Mfrs. v. Equitable Life Assurance Soc'y of the United States (In re United Merchants & Mfrs.),* 674 F.2d 134, 137 (2d Cir.1982). They argue that nonetheless, the reasonableness standard of Code § 506(b) must be satisfied. The Series B Noteholders do not dispute this latter legal proposition.

The Plaintiffs first argue that the $15,668,324 amount is unreasonable: The make-whole formula utilized in the NPA in effect allows the Series B Noteholders to "double count," because the proof of claim as filed does not account for the postpetition interest the consenting Series B Noteholders have been receiving on all unpaid principal amounts.

■ The Series B Noteholders have not directly addressed this argument, and in their amended proof of claim, they provide the Court with the Amended Make–Whole Amount contingent on the Court's determination that the adequate protection payments should be applied to interest accruing on the Series B Notes. On this double-counting issue, I agree with the Plaintiffs. It would be wholly unreasonable for the Series B Noteholders to be compensated twice. Hereinafter, the issues raised by the cross-motions for judgment on the pleadings will be evaluated in the context of the Amended Make–Whole Amount, i.e., $13,955,576.

■ The Plaintiffs next argue that the Amended Make–Whole Amount is "unreasonable even when viewed on its own terms under the NPA." (Doc. # 24 at 13.) They cite a number of cases that, they argue, stand for the proposition that a prepayment premium must reflect actual damages and that, absent a showing of actual harm, the premium is disallowed as a windfall at the expense of unsecured creditors. For example, in *In re Duralite Truck Body & Container Corp.,* 153 B.R. 708, 710 (Bankr.D.Md. 1993), a prepayment charge was calculated by averaging the total interest earned on the loan, multiplying that number by the number of months remaining in the term of the loan, and dividing that product by two. This formula presumed a loss and produced the same number regardless of whether market interest rates went up or down since the inception of the loan. The formula did not reflect actual changes in market interest and failed to discount to present value. The *Duralite*

court disallowed recovery of this prepayment charge as unreasonable. *Id.* at 714–15.

Another case the Plaintiffs cite is *In re Kroh Bros. Dev. Co.*, 88 B.R. 997, 1000–1002 (Bankr.W.D.Mo.1988). That court addressed a prepayment penalty of about $2,173,000 that did not discount to present value the remaining payments due under the loan. This formula resulted in a huge windfall to the secured creditor. Moreover, the penalty equated to approximately 25% of the principal amount of the loan. The *Kroh* court cited with approval case law permitting percentages of up to 10%. Applying both state law and Code § 506(b), the *Kroh* court held that the penalty was unreasonable.

The Plaintiffs apply this case law and argue that the Series B Noteholders cannot show damages in an amount commensurate with the Amended Make–Whole Amount.

The Series B Noteholders argue, and I agree, that the facts here distinguish the basis for the make-whole premium due under the NPA from the basis for the premiums in the cited cases. Pursuant to the NPA, the make-whole claim is calculated as the outstanding principal and remaining interest payable under the Series B Notes discounted to present value using a discount rate equal to 0.50% over Treasury rates of the same weighted average life to maturity as the Series B Notes. NPA § 12.1, at 88, 101. The make-whole claim assumes that the Noteholders will be able to reinvest proceeds at a reinvestment rate equal to the relevant Treasury rate plus 0.50%, and therefore the Noteholders will suffer economic damage to the extent the reinvestment rate at the time of an early repayment is less than the contract rate. Conversely, as I understand the formula, if the reinvestment rate at the time is more than the contract rate, there is no economic damage and the calculated premium is zero.

In contrast to the above cases, the Series B Notes under the NPA have a fixed rate of interest, and the make-whole formula in the NPA accounts for changes in the Treasury rate, decreases over time, and has no applicable "minimum charge." The formula is thus reasonable. Furthermore, the amount of the make-whole claim as a percentage of the principal is reasonable. The Amended Make–Whole Amount of $13,955,576 is about 6.9% of the $202 million principal amount of the Series B Notes.

Thus, to the extent they are relevant, the cases relied upon by the Plaintiffs support the Series B Noteholders' contention that the make-whole formula and the claimed amount are reasonable.

Finally, in support of their unreasonableness argument, the Plaintiffs argue that the NRA "transformed" the prepayment premium from a mechanism to compensate the Series B Noteholders for the potential loss of expected interest into a penalty to be imposed upon default. The Plaintiffs argue that the Debtor has performed all of its economic obligations to the Series B Noteholders and that allowing the Amended Make–Whole Amount would give the Series B Noteholders a windfall solely because of the Debtor's Chapter 11 filing.

The underpinnings of this argument either lack factual support in the record or have previously been discussed and found to be without merit. Under the NPA, the Debtor had an obligation to pay the Amended Make–Whole Amount upon a prepayment. The NRA deferred this obligation and waived it as long as certain conditions were satisfied. These conditions were never satisfied. The benefits received by the Series B Noteholders under the NRA were in exchange for substantial benefits that the Debtor received. The Amended Make–Whole Amount provided for by the NPA does not result in a windfall for the Series B Noteholders; it is a contractually bargained-for result. The Plaintiffs have alleged nothing to support a finding that the result is unreasonable vis-à-vis Code § 506(b).

I find that the Amended Make–Whole Amount is not a penalty and is "reasonable" within the contemplation of Code § 506(b), in terms of both the formula used to calculate that amount and that amount as a percentage of the principal.

### 4. Claim Six

In reference to Claim Six, the Plaintiffs request that in the event that any

or all of the make-whole claim is allowed, any distribution to the Series B Noteholders upon that allowed claim be equitably subordinated to the prior recovery in full upon the allowed claims of all the other creditors of the Debtor's estate. The Plaintiffs do not argue inequitable conduct on the part of the Series B Noteholders, and such conduct need not be found for the Plaintiffs to be entitled to equitable subordination. *See Burden v. United States,* 917 F.2d 115, 120 (3d Cir. 1990). Instead, the Plaintiffs argue that the Series B Noteholders will receive more than 100 cents on the dollar, while the unsecureds will receive less than twenty cents on the dollar. The Plaintiffs also reassert the nature of the make-whole claim as a penalty and conclude for these reasons that the make-whole claim is inequitable and should be subordinated. There is no statutory or case law to support the Plaintiffs' position. Indeed, their position flies in the face of bankruptcy law fundamentals.

The Plaintiffs rely on five cases. Four of those cases[8] involved statutory penalty claims in favor of the government intended to punish a citizen for illegal conduct. Those cases do not help the Plaintiffs. Their holdings on the subordination issue are no longer good law in light of *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996)(rejecting holdings in *Burden* and *In re Virtual Network Servs.*).

The fifth case the Plaintiffs cite involved the claims of investors who had been defrauded by a debtor engaged in a Ponzi scheme. *See generally In re Taubman,* 160 B.R. 964 (Bankr.S.D.Ohio 1993). The investor claimants sought damages that were the sum of their actual pecuniary loss (the "A" claim) and damages for lost profits in excess of their pecuniary loss (the "B" claim). The court concluded that to allow an investor a distribution upon his "B" claim would actually advance the fraudulent Ponzi scheme and would thus be inequitable. The court subordinated the "B" portion of all claims to the

"A" portions of all claims and held that "B" claims would not receive any distribution until all "A" claims were paid in full. *Id.* at 980–82.

*In re Taubman* is distinguishable on both the facts and the law. The equities bear no relation to those here; in addition, the remedy granted in *In re Taubman* was properly limited to the extent of the inequity.

Here, distinct from all the Plaintiffs' cited cases, the claim of the Series B Noteholders is not based upon a statute, but instead is based upon an agreement between the parties that resulted from arm's-length negotiations. As previously discussed, the claim is not in the nature of a penalty. The claim is based upon a fair formula, and the amount of the claim as a percentage of the principal is fair.[9] The Plaintiffs have shown nothing other than the fact that unsecured creditors will receive less than \$.20 on the dollar as a basis for subordination. But disparate treatment of unsecured creditors obviously is not the test for subordination. It appears that the Plaintiffs would have the Court adopt some broad rule of equity to override the priority principles of bankruptcy law in order to achieve a "fair" result. I am not inclined to do that.

Viewing the pleadings in the light most favorable to the Plaintiffs, I find that the Plaintiffs have not shown grounds for equitable subordination.

Based upon the foregoing, I will enter an order granting judgment in favor of the defendant Collateral Agent on Claims Four, Five, and Six of the complaints. Claims One, Two, and Three, which are not addressed by this opinion, raise alternative grounds as to why the Series B Noteholders are not entitled to interest, fees, costs, or charges. These arguments, if upheld, would affect the allowed amount of the claims of the Series B Noteholders. Therefore, I will not at this

8. *Burden,* 917 F.2d 115; *In re Virtual Network Servs. Corp.,* 902 F.2d 1246 (7th Cir.1990); *In re F.D. Roberts Sec., Inc.,* 115 B.R. 485 (Bankr. D.N.J.1990); *In re F.A. Potts & Co.,* 114 B.R. 92 (Bankr.E.D.Pa.1990).

9. Indeed, the Debtor agreed in the NPA that the make-whole payment constituted "compensation to the holders of such Notes for the loss of their investment opportunity and not as a penalty." NPA § 11.1(*o*), at 71.

time enter an order establishing the allowed amount of those claims.