### In re SCHWEGMANN GIANT SUPERMARKETS PARTNERSHIP, Debtor.

No. 00–15876.

United States Bankruptcy Court, E.D. Louisiana.

June 22, 2001.

Robin B. Cheatham, Adams & Reese, New Orleans, LA, Counsel for ATEL Cash Distribution Fund, L.L.P.

Douglas D. Dodd, Stone, Pigman, New Orleans, LA, Counsel for Stone Pigman Walther, Wittmann & Hutchinson, L.L.P.

Hansel M. Harlan, New Orleans, LA, Counsel for Monumental Life Insurance Co.

Richard W. Martinez, New Orleans, LA, Robert E. Tarcza, Tarcza & Gelderman, New Orleans, LA, Counsel for Debtor.

## REASONS FOR ORDER

JERRY A. BROWN, Bankruptcy Judge.

This matter came before the court on May 7, 2001 on the debtor's objection to proof of claim filed by Monumental Life Insurance Co.[1] ATEL Cash Distribution Fund, L.L.P. ("ATEL") and Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P. ("Stone Pigman") filed memoranda in support of the debtor's objection.

The issue to be determined is whether Monumental is entitled to a "yield maintenance premium" in the claimed amount of $1,295,254.44 as a result of the prepayment of the loan from Monumental.

For the reasons stated below, the court finds that Monumental is not entitled to the yield maintenance premium and therefore **GRANTS** the debtor's objection to that portion of Monumental's claim.

### I. *Factual Background*

Monumental's claim is based upon a loan made in March 1991 to the debtor in the sum of $8.4 million. The promissory note between Monumental and the debtor includes the following language in Paragraph 6 waiving the right to prepay the note:

> . . . Borrower expressly waives any right to prepay the indebtedness evidenced hereby, except as specifically provided above in this Paragraph 6 and in Paragraph 7 hereof. Therefore, if the maturity of this Note is accelerated by reason of any default hereunder or under any other Loan Document, Borrower agrees that any prepayment of the indebtedness evidenced hereby resulting from such default, including any redemption following foreclosure of the Mortgage, shall constitute a breach of the restrictions on prepayment set forth

herein. Borrower recognizes that prepayment of this Note as a result of foreclosure and sale, or as a result of sale under a power of sale, will result in damages to Holder due to Holder's failure to receive the benefit of its investment as contracted for in this Note.[2]

The penalty for prepayment, also in Paragraph 6, is:

> If no prepayment is permitted at the time of such foreclosure sale, or prepayment of the indebtedness evidenced hereby occurs during a period when this Note is closed to prepayment and is the result of such default, the prepayment premium shall be deemed to be the greater of ten percent (10%) of the amount prepaid or the sum of one percent (1%) of the amount prepaid plus an amount equal to one-twelfth of the present value of the Annual Yield Differential (using a discount factor of 10.125%, and defined below) multiplied by the number of months from such prepayment until the Final Maturity Date of this Note, times the outstanding principal balance of the Loan.[3]

Thus, the prepayment premium calculation or "yield maintenance premium" awards Monumental the greater of:

(1) a fixed 10% of the prepaid principal, or

(2) the sum of a figure based on the difference in value of payments under current versus contract interest rates plus 1% of prepaid principal.

The first prong is a "fixed rate" prepayment penalty, while the second is a type of "yield maintenance" premium, but with an additional 1% bonus to Monumental.

---

1. Pl. 182.

2. Pl. 266 at Ex. D, ¶ 6 at 3.

3. Pl. 266 at Ex. D, ¶ 6 at 4.

## II. *Procedural Background*

On September 20, 2000, the debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

On November 30, 2000, the debtor received a letter of intent from Home Depot, U.S.A., Inc. to purchase the debtor's property at 2625 Veterans Memorial Boulevard, Kenner, Louisiana (the "property"). When the debtor delayed acting on the offer, Stone Pigman filed a motion to compel the debtor to consummate the sale.[4] By order entered on January 5, 2001, the court granted the motion to compel, and ordered the debtor to file an expedited motion for authority to sell property no later than January 15, 2001.[5]

The debtor's motion to sell free and clear of liens was filed on January 10, 2001.[6] At the hearing held on the motion on January 22, 2001, the court approved the contemplated sale of the property, and due to the numerous creditors who alleged a lien, claim, and/or encumbrance on the property, ordered the creditors to file an adversary complaint to determine the rank, priority, and validity of liens. The court also ordered that the proceeds of the sale be set aside until further order of the court. The order approving the motion and escrowing the funds was entered on February 1, 2001.[7]

On February 9, 2001, ATEL, Stone Pigman, and other creditors filed Adversary Complaint No. 01–1026, which sought to determine the validity, amount, and priority of liens. Contemporaneously therewith, the plaintiffs filed an ex parte motion for an order requiring the creditors to file statements of their claims.

Monumental never objected to the sale or the early payment of its note. Instead, on February 16, 2001, Monumental filed in the main case Proof of Claim # 99 in the amount of $7,220,356.76 with interest and the other charges and fees owing under the loan continuing to accrue postpetition. On March 16, 2001, Monumental filed its statement of claim in the adversary proceeding seeking recovery of prepayment penalties and default interest from the sale of the proceeds of the property.[8] Monumental filed its amended statement of claim on April 10, 2001, asserting a claim of $8,609,776.26, comprising principal, interest, default interest, prepayment premium, attorneys' fees, and other items.[9] The amended statement of claim itemizes as elements of its claim $117,185.45 in default interest, and $1,295,254.44 as a "yield maintenance premium".[10]

The property was sold to Home Depot on March 5, 2001, which resulted in net sale proceeds of $15,014,213.18.[11] After the parties stipulated as to the principal amount owed to Monumental, the court signed a consent order providing that the debtor would pay to Monumental the sum of $7,138,229.81, representing the agreed principal amount owed. Some of the other secured creditors subordinate to Monumental were paid either the principal amount of their claims or an agreed upon amount. The debtor continues to maintain in escrow $1,470,931.57 for the account of Monumental, which represents the remain-

---

4. *See* Pl. 64.

5. *See* Pl. 75.

6. Pl. 80.

7. Pl. 109.

8. Pl. 107 in Adv. Pro. No. 01–1026.

9. Pl. 134 in Adv. Pro. No. 01–1026.

10. *See* Pl. 297, Monumental's Response to the Debtor's Objection at 21.

11. Pl. 182 at 4.

ing amounts claimed by Monumental, without prejudice to the rights of the debtor and other creditors to contest Monumental's entitlement to that amount.

After the hearing on May 7, 2001 on the debtor's objection to proof of claim, Monumental withdrew its $117,185.45 claim for default interest. Consequently, the only remaining issue is whether Monumental is entitled to a yield maintenance premium of $1,295,254.44.

Monumental stipulated that the loan was not in default immediately prior to the time that the debtor filed for bankruptcy relief.[12] Monumental continued to receive its regular payments under the note during the entirety of the bankruptcy.

### III. *Burden of Proof*

Bankruptcy Rule 3001, entitled "Proof of Claim", provides in subsection (a):

**Form and Content.** A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form.

Rule 3001(f), entitled "Evidentiary Effect", further provides:

A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

■ Rule 3001(f), however, does not address the burden of proof when a trustee (or a Chapter 11 debtor-in-possession) disputes a proof of claim.[13] The burden of proof is a "substantive" aspect of the proof

of claim. "That is, the burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it."[14] The burden of proof, therefore, is borne by the same party who would bear the burden if the contest took place outside of bankruptcy.

■ Monumental bears the ultimate burden of proof in this case because it is claiming a right to damages under a contract.

### IV. *Analysis*

#### A. *Reasonableness under 11 U.S.C. § 506(b)*

■ Section 506(b) of the Bankruptcy Code, 11 U.S.C. § 506(b), provides that:

To the extent that an allowed secured claim is secured by property, the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The parties have stipulated that Monumental is an oversecured creditor. Therefore, Monumental is entitled to charge the yield maintenance premium if it is a "reasonable fee" in accordance with Section 506(b).

■ The determination of whether to award prepayment fees is a question of federal law controlled by Section 506(b).[15]

---

**12.** Stone Pigman Ex. 1. Monumental initially asserted that the filing for Chapter 11 relief was a default that entitled it to collect interest at the contractually agreed upon default rate. Monumental, however, withdrew its claim for default interest.

**13.** *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 1956 n. 2, 147 L.Ed.2d 13 (2000).

**14.** *Raleigh,* 120 S.Ct. at 1955.

**15.** *In re Duralite Truck Body & Container Corp.,* 153 B.R. 708, 712, 713 (Bankr.D.Md.

In addition to conducting a Section 506(b) analysis, some courts have scrutinized prepayment clauses under a liquidated damages analysis under state law.[16] An analysis under Louisiana law is not necessary in this case, however, because as discussed below, the prepayment penalty is unreasonable under Section 506(b).[17]

Monumental's agreement with the debtor uses a prepayment premium calculation that awards Monumental the *greater* of two sums computed using two different formulas.[18] The premium is the greater of: (a) a fixed 10% of the prepaid principal, or (b) the sum of a figure based on the difference in value of payments under current versus contract interest rates plus 1% of prepaid principal. Monumental claims it is entitled to a yield maintenance premium of $1,295,254.44, based upon the second prong of the prepayment premium formula.

■ To evaluate reasonableness, the initial inquiry is the purpose of the prepayment premium.[19] As stated in the case of *In re Duralite Truck Body & Container Corp.,*

Generally, prepayment premiums protect lenders against falling interest rates. Without a prepayment premium, a borrower would have an incentive to refinance the debt, thus depriving the lender of the benefit of its bargain, namely, the unearned interest at above current market rates over the unexpired term of the loan.[20]

Several bankruptcy courts have limited recovery of prepayment penalties to actual losses.[21] The *Duralite* court stated:

This court approves of actual damages as the measure of reasonableness for prepayment charges under 11 U.S.C. § 506(b). A prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as either a penalty on the debtor or a windfall to a lender, at the expense of other creditors of the bankruptcy estate. Only a prepayment charge formula which reasonably measures actual damages will be respected under § 506(b). Case law suggests that actual damages are measured by the difference between the market rate of interest at the time of prepayment and the contract rate for the duration of the loan, discounted to present value. *See In re Imperial Coronado Partners, Ltd.,* 96 B.R. 997, 1001 (9th Cir. BAP 1989); *In re A.J. Lane & Co., Inc.,* 113 B.R. 821, 829 (Bankr. D.Mass.1990).[22]

1993); *In re A.J. Lane & Co., Inc.,* 113 B.R. 821, 823–24 (Bankr.D.Mass.1990).

16. *See e.g., In re Duralite Truck Body & Container Corp.,* 153 B.R. at 711–12.

17. Even if Monumental is entitled under Louisiana law to the yield maintenance premium (a very close question), this fee must pass muster under Section 506(b). *In re Hudson Shipbuilders, Inc.,* 794 F.2d 1051, 1058 (5th Cir.1986).

18. *See* ¶ 6 of the promissory note, *supra* at 2.

19. *Duralite,* 153 B.R. at 713.

20. *Duralite,* 153 B.R. at 713. *See also In re LHD Realty Corp.,* 726 F.2d 327, 330 (7th Cir.1984)(Prepayment premiums serve a valid purpose in compensating at least in part for the anticipated interest a lender will not receive if a loan is paid off prematurely.)

21. *See Duralite,* 153 B.R. at 714, and cases cited therein; *In re Outdoor Sports Headquarters, Inc.,* 161 B.R. 414, 424 (Bankr.S.D.Ohio 1993); *In re Foertsch,* 167 B.R. 555, 562 (Bankr.D.N.D.1994)("Section 506(b) should be generally interpreted to provide only for those costs and fees which an oversecured creditor *actually* incurs.")(Emphasis in original.)

22. *Duralite,* 153 B.R. at 714.

The *Duralite* court found that the prepayment premium involved was not reasonable under Section 506(b) because

> The prepayment charge formula presumes a loss. It produces the same result, regardless of whether market interest rates have gone up or down since inception of the loan. It does not reflect actual changes in market interest, and it fails to discount to present value. The prepayment charge formula does not effectively estimate actual damages, and consequently the charge is unreasonable under § 506(b).[23]

Similarly, the prepayment formula in this case presumes a loss. Under the first prong, Monumental receives 10% of the prepaid principal, regardless of whether Monumental would actually come out ahead on the prepayment, if, for example, interest rates had gone up. The second prong of the test is also unreasonable because it tacks on an additional 1% of the prepaid principal.

The bankruptcy court in the case of *In re Kroh Bros. Development Co.*,[24] held that a prepayment penalty greater than 10% was unenforceable as being too high.

In this case, the fixed rate formula would result in a 10% premium, or more than $700,000, while the alternative yield maintenance calculation generates close to a $1.3 million premium—an 18% "yield maintenance premium".[25]

## B. *Monumental's burden*

Monumental did not attempt to introduce any evidence as to its damages, but included only an exhibit that shows how the yield maintenance premium was calculated.[26] Monumental contends that its damages are "obvious", and argues that the objectors offered no evidence to show that the yield maintenance premium is unreasonable.

Monumental's argument is an improper attempt to shift the burden of proof. As discussed above, the burden of proof in an objection to claim in bankruptcy was addressed in the recent United States Supreme Court case of *Raleigh v. Illinois Dept. of Revenue*.[27] In *Raleigh*, the Supreme Court held that the burden of proof is an essential element of the claim, and the burden of proof is borne by the same party who would bear the burden if the contest took place outside of bankruptcy. As it relates to this case, the *Raleigh* decision did not change the burden of proof applicable to an objection to proof of claim in bankruptcy. A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim.[28] The objecting party then has the burden of producing evidence to rebut the claim.[29] The objecting party must produce evidence that is "of probative force equal to that of the creditor's proof of claim."[30] If such evidence is produced, the claimant must produce evidence that proves the claim by a preponderance of the evidence.[31] The claimant always carries the

23. *Duralite,* at 714–15.

24. 88 B.R. 997 (Bankr.W.D.Mo.1988).

25. $1,295,254.44 ÷ $7,138,229.81 = .1815

26. *See* Pl. 297, Monumental's Response at Ex. 7.

27. *Supra* at 5.

28. Bankr.Rule 3001(f); *In re Fidelity Holding Co.,* 837 F.2d 696, 698 (5th Cir.1988).

29. *Fidelity Holding Co.,* 837 F.2d at 698.

30. *In re Simmons,* 765 F.2d 547, 552 (5th Cir.1985).

31. *Fidelity Holding Co.,* 837 F.2d at 698.

ultimate burden of proof.[32]

Monumental's proof of claim as originally filed was prima facie evidence as to the validity and amount of the claim. The objectors introduced the parties' stipulation that the loan was not in default immediately prior to the time that the debtor filed for bankruptcy relief,[33] and that Monumental received the note payments throughout the course of the bankruptcy. The objectors also cited the deposition testimony of James Henderson, the witness Monumental designated as a Rule 36(b) representative to testify regarding Proof of Claim No. 99, including the supporting documentation and calculation of all amounts claimed.[34] Mr. Henderson testified that he had "no idea" what Monumental's damages would be as a result of the payment of the loan ahead of schedule.[35] The claimed yield maintenance premium is 18% of the unpaid principal amount of the loan. If the yield maintenance premium is paid to Monumental, the debtor's other secured creditors who are in line after Monumental will not be paid in full. In fact, as shown by the record, some secured creditors that are lower in ranking, such as Stone Pigman, will receive no payment if Monumental is awarded the yield maintenance premium.

Under these circumstances, the objectors have rebutted Monumental's prima facie claim. It was then incumbent upon Monumental to introduce evidence as to the amount of its damages. Monumental, who is attempting to assert it is entitled to a certain category of damages under its contract with the debtor, bears the burden of proof on that issue. It is insufficient for Monumental to say that the objectors have failed to carry their burden of producing factual evidence that rebuts Monumental's claim. Monumental has not introduced any evidence of actual damages it has or will sustain as a result of the prepayment. Indeed, even in the case of *In re Hidden Lake Ltd. Partnership*,[36] relied upon by Monumental, four witnesses testified at the hearing on the issue of whether the debtor was required to pay prepayment charges, and the lender put on evidence as to the market rate of interest. The court finds that Monumental has failed in its burden of proving the amount of its proof of claim.

The case of *In re Hidden Lake Ltd. Partnership*, cited by Monumental to support its contention that the yield maintenance premium is reasonable, is distinguishable from this case. In *Hidden Lake*, the Bankruptcy Court for the Southern District of Ohio allowed a prepayment charge of approximately $2.7 million as a liquidated damages provision, finding that although the calculation of damages under the yield maintenance formula would generally overcompensate the creditor, the amount of the overcompensation, given the uncertainties accompanying the prediction of probable actual damages, was not so great that the court could find that the clause was intended to punish the debtor, rather than compensate the creditor.[37] In *Hidden Lake*, however, the debtor had defaulted on the note, and the creditor had accelerated the loan, begun a foreclosure action, and had appointed a receiver for

---

32. *Id.; In re Placid Oil Co.*, 988 F.2d 554, 557 (5th Cir.1993).

33. *See* Stone Ex. 1.

34. *See* Stone Ex. 2, Deposition of James D. Henderson of Apr. 15, 2001 at Ex. 4, p. 2.

35. Stone Ex. 2, Deposition of Henderson at 113.

36. 247 B.R. 722 (Bankr.S.D.Ohio 2000).

37. *Hidden Lake*, at 730.

the property before the debtor filed its petition in bankruptcy.[38]

Monumental's reliance on the case of *In re Anchor Resolution Corp.*,[39] is also misplaced. First, in *Anchor* there was a default by virtue of the failure to pay Series B Noteholders in full upon a change in control resulting from a December 1996 sale. By contrast, there was no default in this case immediately prior to the bankruptcy filing. Second, in *Anchor Resolution*, the court permitted a prepayment penalty based upon a "make-whole formula." The make-whole amount that was found to be reasonable in *Anchor* was approximately 6.9% of the principal,[40] as compared to the 18% of principal in the present case. Third, the *Anchor Resolution* make-whole formula provided that if the reinvestment rate at the time of prepayment was more than the contract rate, there was no economic damage, and the calculated premium was zero.[41] In this case, however, there is a 10% prepayment penalty even if the reinvestment rate is higher than the contract rate and there is no economic damage.

Finally, *Hidden Lake* did not consider the equities of the case at all, while *Anchor Resolution* considered the equities only with respect to the debtor's assertion that the claim of the Series B Noteholders should be equitably subordinated to the unsecured creditors. The court is not required to follow these cases, and is not persuaded by their reasoning.

### C. Balancing the equities

■ This court must consider the equities in making the determination as to whether the prepayment premium is reasonable.[42] In the case of *In re Southland Corp. v. Toronto–Dominion*,[43] the Fifth Circuit recognized that

> The very purpose of equity is to exalt the individual circumstances of a case over law's hard and fast rules. Thus, *Laymon* referred to "the equities involved in *this* bankruptcy proceeding." 958 F.2d at 75 (emphasis added).

When determining whether the default interest rate should be applied, the Fifth Circuit further stated that "[w]e find it especially significant—as did the bankruptcy court—that no junior creditors will be harmed if the Banks are awarded default interest." Similarly, in the case of *In re Outdoor Sports Headquarters, Inc.*,[44] the bankruptcy court allowed a prepayment fee that was large in comparison to the principal amount, considering the large amount of equity in the property, "and the absence of substantial prejudice to [creditors]."

In examining the equities of this bankruptcy case, the court notes that the debtor was not in default on Monumental's loan immediately prior to the bankruptcy, and Monumental does not claim any other default in connection with its claim for a

---

**38.** *Id.* at 726.

**39.** 221 B.R. 330 (Bankr.D.Del.1998).

**40.** 221 B.R. at 341.

**41.** *Id.*

**42.** *In re Maywood, Inc.*, 210 B.R. 91, 94 (Bankr.N.D.Tex.1997). *See also In re Southland Corp.*, 160 F.3d 1054, 1060 (5th Cir. 1998)(When balancing the equities to determine what interest rate to apply under Section 506(b), court considers the individual circumstances of the case.); *In re Laymon*, 958 F.2d 72, 75 (5th Cir.1992)(The determination of which default interest rate applies under Section 506(b) "must be decided by examining the equities involved in this bankruptcy proceeding".)

**43.** 160 F.3d at 1060.

**44.** 161 B.R. at 425.

yield maintenance premium. Monumental suffered no losses by virtue of the bankruptcy filing—a receiver was operating the property and paid Monumental timely during the approximately five month period after the bankruptcy petition was filed, and before the property was sold. The debtor did not provoke the prepayment by the sale. Instead, the debtor did not want to sell the property to Home Depot, and only sold the property in response to the court's order granting Stone Pigman's motion to compel sale of the property. The note provides for a prepayment penalty fee of 10% to Monumental, regardless of whether Monumental actually incurred any damages as a result of the prepayment. The "yield maintenance premium" claimed by Monumental is approximately 18% of the principal amount of the loan, which principal amount has already been paid to Monumental. Monumental's 30(b)(6) representative was unable to articulate the damages Monumental had incurred as a result of the early payoff of the loan. Monumental did not introduce any other evidence as to the actual amount of damages it incurred as a result of the early payoff of the loan. If Monumental's yield maintenance premium is paid in full, the junior secured creditors and unsecured creditors of the debtor will not be paid in their entirety. The net effect of allowing Monumental the premium it seeks is not to redress Monumental for its damages, but instead to penalize the debtor and junior creditors for the debtor's filing of Chapter 11 relief—a highly inequitable result that this court is not willing to condone under all the circumstances of the case.

Therefore, the court finds that the yield maintenance premium claimed by Monumental is unreasonable under Section 506(b), and the charge is disallowed. The court further disallows Monumental's claim for default interest, as having been waived by Monumental. There being no objection to Monumental's claim for accrued interest, sundry advances, and interest accrual on sundry advances, these claims will be allowed. A separate order will be entered accordingly.

## ORDER

For the reasons assigned in the foregoing reasons for order issued this date, accordingly,

**IT IS ORDERED** that the objection of Schwegmann Giant Supermarkets Partnership to the proof of claim filed by Monumental Life Insurance Co. is **SUSTAINED IN PART and DENIED IN PART.**

**IT IS FURTHER ORDERED** that Monumental's claim for prepayment penalties, including a yield maintenance premium, and its claim for default interest, are **DISALLOWED.**

**IT IS FURTHER ORDERED** that Monumental's claim for damages is **ALLOWED** in the following amounts:

| | |
|---|---|
| Accrued interest (10.125% annual interest rate; 36 days × $2,007.63 per diem) | $72,274.68 |
| Sundry Advances | 6,738.35 |
| | $79,013.03 |

**IT IS FURTHER ORDERED** that Schwegmann Giant Super Markets, through Andry, Andry & Williamson (escrow agent), pay to Monumental without further delay the sum of **$59,013.03,** which represents Monumental's allowed claim, less a positive $20,000 escrow balance. If Monumental wishes to update its claim for sundry advances and interest accrual on sundry advances, it may file an updated accounting within 10 days. The objectors have an additional 10 days thereafter to file an opposition, if any.

**IT IS FURTHER ORDERED** that Monumental's claim for attorneys' fees is **ALLOWED.** Monumental is to file its

statement of attorneys' fees within 10 days of entry of this order. The objectors have an additional 10 days thereafter to file an opposition, if any. The court will determine the amount of attorneys' fees, sundry advances, and interest accrual on sundry advances based on the briefs and pleadings filed, unless there is a clear need for oral argument.