THE FIRST NATIONAL BANK OF SPRINGFIELD, Plaintiff-Appellant, v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant-Appellee.

Fourth District No. 4—87—0038

Opinion filed June 29, 1987.

LUND, J., specially concurring.

Brown, Hay & Stephens, of Springfield (Harvey B. Stephens and William F. Trapp, of counsel), for appellant.

Phebus, Tummelson, Bryan & Knox, of Urbana (George G. Bryan, of counsel), for appellee.

JUSTICE GREEN delivered the opinion of the court:

The sum of $27,000 is contested here. Plaintiff, the First National Bank of Springfield (bank), asserting unjust enrichment, brought this action to require the return of that sum from the defendant, Equitable

Life Assurance Society of the United States (Equitable). Equitable lays claim to the money as a valid prepayment penalty received under the terms of a promissory note and mortgage. The circuit court of Sangamon County considered motions for summary judgment on behalf of both parties and granted Equitable's motion. This appeal followed.

The following facts appeared of record at the time of entry of judgment. The note at the center of this controversy was executed on April 1, 1977, in the amount of $1.15 million by J&J Ranch, Inc., with the First National Bank of Decatur as trustee. Security for the loan was a mortgage taken by Equitable on two separate parcels of land: a 320-acre tract in Macon County and a 350-acre farm in DeWitt County. A clause in the promissory note states as follows:

"Payment Privileges: Privilege to repay in whole or in part at any time provided payee may require payment of *not more than six months advance interest on that part of the aggregate amount of all prepayment in one year which exceeds 20% of the original principal* amount of this indebtedness." (Emphasis added.)

Further, the mortgage document, also dated April 1, 1977, contains what is commonly referred to as a "due-on-sale clause":

"That in the event mortgagor sells or conveys the premises described herein, or any portion thereof, then at the option of the mortgagee the entire indebtedness shall become due and payable."

Excerpts from portions of the deposition testimony attached to the respective motions for summary judgment allow us to further summarize the following facts: At some point subsequent to the first transaction, the First National Bank of Springfield loaned additional money to Greg Johnston, the owner of J&J Ranch. Johnston, however, began to suffer financial difficulties and several mortgage payments were not met. These parties later reached an agreement whereby the Johnstons would deed over the properties to the bank in return for cancellation of the debt. The bank would then assume total responsibility for the properties, including continued payments on the mortgage with Equitable. The bank also brought the Equitable loan up to date once the transaction was consummated.

Duane L. Gerlach, vice-president and chief lending officer of the bank, stated he discussed the ramifications of taking over the loan with Edwin J. Brown, regional vice-president of Equitable, in November of 1982. Brown stated Equitable would allow the bank to assume the principal and interest indebtedness on the mortgage under the existing terms and conditions for a one-year period. According to Gerlach,

Brown could make no assurances beyond that time, indicating Equitable could impose a new higher interest rate not to exceed 12% per annum or it could call the loan due and payable when the year was up. Brown stated in his deposition he did write a letter informing the bank that Equitable may at its option either increase the interest rate or "call the loan in" at the end of one year. However, neither eventuality took place.

The transaction with the Johnstons was completed on December 6, 1982. In lieu of the outstanding debt, the bank received the deeds for both the Macon and DeWitt County properties and acquired possession of those parcels subject to the first mortgage to Equitable. The loan was then brought up to date. A representative of Equitable stated they were not informed of the deed over until March of 1983, however.

During the latter part of 1983, the bank found a potential buyer for the Macon County farm: the Creek Lake Corporation (Creek Lake). In October of 1983 the bank inquired whether Equitable would consider dividing the mortgage between the two parcels. Equitable responded it did not wish to split the loan. In December of 1983, John Slayton, agribusiness/overlying lending officer for the bank, contacted Ronald Rinkenberger, Equitable's area investment manager. Slayton wanted to know if Equitable would require prepayment of the entire loan, or whether the prepayment clause in the note could be negotiated or abolished. Rinkenberger responded the prepayment penalty was not subject to negotiation. If a prepayment was made, the bank would be responsible for the penalty. Rinkenberger did state Equitable could allow a buyer to assume $530,000 of the loan at 10.5% per annum over 15 years.

Slayton then contacted Brown regarding Equitable's position of requiring full payment of the mortgage on both parcels while also leaving the prepayment clause in effect. Brown informed Slayton the prepayment provision would not be abolished or negotiated. In response to Slayton's concern over minimizing the prepayment fee, Brown told Slayton any potential penalty could be reduced in the event the property is sold by paying 20% of the original balance before the end of the 1983 calendar year, as per the terms of the prepayment clause. It appears a payment of $230,000, amounting to 20% of the original principal balance, was then wired to Equitable during the last week of December 1983.

The bank on January 5, 1984, entered into a contract for the sale of the Macon County land to Creek Lake. An attorney for the buyers began discussions with Equitable concerning assuming the mortgage on the Macon County property. According to Slayton, he determined in

conversations with the buyer's attorney that Equitable was requiring the buyers to either furnish a personal guarantee or additional collateral for the loan. Slayton stated in his deposition that Rinkenberger, area investment manager for Equitable Agribusiness, Inc., told him in January of 1984 he did not know at that time which of those options the buyers would decide upon. Rinkenberger informed Slayton the Macon County property had been appraised at $2,600 per acre, and Equitable would allow the buyers to assume more than the $530,000 balance remaining on that land. However, the buyers never did assume the loan. Slayton had no firsthand knowledge whether this resulted from Creek Lake's inability to meet Equitable's additional terms. It is not apparent from the record what actually transpired during those negotiations.

Slayton stated he then questioned Brown once more on February 2, 1984, if Equitable would still demand full payment on the entire mortgage, or whether they could leave a balance on the DeWitt County property. Brown again indicated Equitable was unwilling to split the loan between the Macon and DeWitt parcels.

The bank then received a letter dated February 3, 1984, from Kenneth E. Smisek, assistant regional manager for Equitable, quoting the total amount necessary to pay off the loan. That total was calculated based on the remaining principal indebtedness on both properties plus interest and a prepayment fee. Smisek stated he sent the letter out in response to a request by Slayton for the amount of payoff in order to obtain a release. The letter stated in part:

> "We understand that you have sold the [Macon County property], and *a release of this tract is desired*. Since we are unwilling to retain a portion of this loan on the remaining tract, it will be necessary that funds for the entire balance of the loan be paid in accordance with the following statement ***." (Emphasis added.)

The letter recited a principal balance of $806,000. Pursuant to the terms of the prepayment privilege clause contained in the note, that balance could be reduced by 20% of the original balance, or $230,000, without being subject to a prepayment fee. The prepayment terms would then be applied to the remaining $576,000, leaving a corresponding fee of $27,000 computed as six months' advance interest on the remaining aggregate in excess of 20% of the original principal. The letter concluded that when the funds were received, a release would be ordered and the payoff processed. Canceled mortgage papers and the release would only then be forwarded to the bank.

The closing date for the sale to Creek Lake was set for February

27, 1984. On February 9, Slayton called Equitable to inform them the funds would be wired with the exception of the quoted prepayment penalty. Slayton indicated the bank was considering legal action against Equitable regarding the penalty. On February 15, the bank tendered the principal and interest due without the prepayment fee. Equitable responded on February 16 by stating the payoff would not be accepted and the funds would be returned if payment in full according to the terms of the note, including the prepayment fee, was not forwarded. Smisek stated he sent a message to Slayton indicating Equitable would not issue a mortgage release without the prepayment fee.

The bank then wired $27,000 to Equitable, informing them litigation over that sum was still a possibility. The sale to Creek Lake went ahead as scheduled on February 27, 1984.

The bank on April 26, 1984, filed a two-count complaint contesting Equitable's right to the $27,000 sum as a prepayment penalty and requesting reimbursement of that sum. Count I alleged Equitable's entitlement to a prepayment premium had expired five years after the execution of the note according to its terms. Count II asserted Equitable itself had accelerated the loan to maturity, and thus Equitable was not entitled to collect any prepayment penalty.

A hearing on the respective motions for summary judgment was held on November 24, 1986. On December 8, 1986, the date trial was scheduled to begin, the court granted Equitable's motion for summary judgment. A formal written judgment order was entered December 17, 1986, and the bank filed its notice of appeal on January 15, 1987.

The bank first questions on appeal whether Equitable had any right to invoke the prepayment language of the note against it. As no formal written or oral mortgage assumption argument was ever executed by these parties, the bank asserts it did not bargain for the language and should not be bound by it. We do not see how this makes a difference. The prepayment clause is a valid condition running with the land. When the bank accepted the deed and took title to the land in question, it did so subject to Equitable's first mortgage and note. Lack of a formal agreement to assume the mortgage is irrelevant.

■ We then consider the propriety of judgment entered on count I of the bank's complaint. According to the prepayment privilege provision contained in the note, there could be no penalty for prepayment of the loan if payment during any calendar year did not exceed 20% of the original principal indebtedness. The bank claims under count I this prepayment clause can be interpreted to expire within five years after execution of the note, since by its terms a full 20% payment during each of the first five years would satisfy the principal indebtedness without

ever incurring a penalty. This interpretation is severely limited, and the reasoning behind it is strained. The express terms of the note itself contain no such limitation or expiration date. Rather, the clear and unambiguous meaning of the prepayment provision is that it is to be applicable during the entire term of the promissory note. Summary judgment as to count I was properly granted.

■■■ We next turn to count II. The bank alleges Equitable elected to accelerate the mortgage indebtedness under the due-on-sale clause. The bank thus asserts where a mortgagee exercises its option to treat an entire indebtedness as due and payable, then it may not also be entitled to a prepayment penalty.

The bank is correct in its statement of the applicable law. No prepayment penalty may be imposed if payment before maturity results from an acceleration of the loan by the mortgagee under the due-on-sale clause or any other clause. (*Casey v. Business Men's Assurance Co. of America* (5th Cir. 1983), 706 F.2d 559.) A mortgagee is not entitled to a prepayment penalty in addition to full payment of the indebtedness where it exercises its contractual right under the due-on-sale clause. *Tan v. California Federal Savings & Loan Association* (1983), 140 Cal. App. 3d 800, 189 Cal. Rptr. 775.

The relevant Illinois case on the topic is *Slevin Container Corp. v. Provident Federal Savings & Loan Association* (1981), 98 Ill. App. 3d 646, 424 N.E.2d 939, cited to us by both parties. In *Slevin*, the court held a lender may not both accelerate the maturity of a note and also exact a premium or fee for prepayment of the loan.

Under the facts in *Slevin*, the plaintiff in 1975 borrowed money from defendant pursuant to the terms of a promissory note. The note contained a prepayment provision similar to the one at issue here. A due-on-sale clause, taken together with the prepayment clause, gave the defendant three express options should the plaintiff transfer its interest in the subject real estate. Defendant could: (1) call for a specified increase in the annual interest rate; (2) declare the entire balance due and owing; or (3) continue to receive monthly payments from the transferee until the mortgage was fully paid and satisfied. In June of 1980, defendant was notified in writing that plaintiff had sold its interest in the real estate. Defendant's attorney responded by letter that defendant would exercise its option to declare the entire balance due in light of the fact the property was now sold. The letter also stated defendant would treat the remaining balance as subject to the prepayment penalty under the terms of the note. When defendant accepted the principal due but declined to release the mortgage until the penalty was paid, plaintiff brought an action seeking a declaratory judgment that defend-

ant be required to release the lien of mortgage without also imposing a prepayment penalty.

On appeal, the *Slevin* court concluded payment by the plaintiff was not voluntary, but was made in response to the defendant's exercise of its option under the due-on-sale clause. The court noted that, " '[W]here circumstances other than the mortgagor's deliberate exercise of the prepayment clause arguably have caused prepayment of the loan, the courts have examined the factual situations presented and have denied enforcement of the penalty where the mortgagor did not voluntarily mature the indebtedness.' " (98 Ill. App. 3d 646, 648, 424 N.E.2d 939, 940, quoting Annot., 86 A.L.R.3d 599, 605 (1978).) The court thus concluded that "where the discretion to accelerate the maturity of the obligation is that of the obligee, the exercise of the election renders the payment made pursuant to the election one made after maturity and by definition not prepayment." 98 Ill. App. 3d 646, 648, 424 N.E.2d 939, 940.

Resolution of this matter therefore turns on whether "prepayment" by the bank was voluntary, or whether in fact it was the result of an acceleration of the indebtedness by Equitable. Should the latter be the case, the loan was already called into maturity by Equitable, and it had forfeited its entitlement to a prepayment fee.

We believe *Slevin* is factually inapposite from the matter presently under our consideration. In *Slevin*, the property in question was already sold. The terms of the note and mortgage afforded the defendant with three clear options. It elected to declare the entire balance due and owing, and was therefore not entitled to additionally collect a prepayment fee. To the contrary, Equitable here did not make such an election. Although the bank views Equitable's correspondence of February 3, 1984, as a demand for payment in full due upon the sale of the property, that letter merely calculated the total amount of payoff for the outstanding balance on both parcels of land which would be necessary in order to obtain a release on the mortgage. Although some economic pressure was exerted on the bank to act, its decision to prepay before the anticipated date of sale was nevertheless voluntary. Equitable never invoked its rights under the due-on-sale clause, an event which would have triggered payment of the entire balance without penalty.

■ Under the terms of a promissory note such as this, a mortgagor is allowed the "privilege" of paying off the balance of the remaining debt by voluntarily maturing the debt prior to the completion of its contemplated term. In return, the mortgagee is authorized to collect a certain sum, usually stated as additional interest. Whether characterized as a "fee," "premium," or "penalty" for prepayment of a loan,

such provisions have been routinely upheld and enforced where the mortgagor's election to call the loan to maturity was voluntary.

The bank also argues an equitable principle which would render the prepayment provision in a note invalid where there is evidence of improper conduct by the mortgagee. We do not read the doctrine announced in *Slevin* as extending that far. In any event, we do not find any impropriety in the mortgagee's conduct.

In sum, the bank chose to invoke its prepayment privilege under the terms of the note as a subsequent purchaser. We have reviewed the other cases cited to us by the bank and find them unavailing to its position. In *Kilpatrick v. Germania Life Insurance Co.* (1905), 183 N.Y. 163, 75 N.E. 1124, the mortgagee chose to accelerate payment by initiating foreclosure proceedings after default and by demanding payment in full of the outstanding obligation. The court held the mortgagee could not then, upon tender of the entire principal and accrued interest by the mortgagor, terminate the foreclosure action but only accept full payment if accompanied by a prepayment "bonus" or penalty. The mortgagee had made an election; that election could not be revoked, the court reasoned, particularly where the mortgagee had changed his position in reliance thereon. Payment here, to the contrary, was not solely the result of an election or decision to accelerate by Equitable.

The bank further asserts summary judgment should be reversed so the cause can at least continue to trial, contending the mere excerpts from depositions appended to the respective motions are an insufficient basis to decide the matter on, and a full trial on the evidence should be held. If the Bank was aware of further evidence which would raise a genuine issue of material fact, it should have directed such evidence to the trial court's attention. We are constrained to review the judgment of the trial court on the basis of the record alone.

In considering the record in the light most favorable to the plaintiff, we concur with the trial court that no genuine issue of material fact exists. (*Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 434 N.E.2d 50.) Summary judgment for the defendant was proper. Accordingly, we affirm the judgment of the circuit court of Sangamon County.

Affirmed.

SPITZ, P.J., concurs.

JUSTICE LUND, specially concurring:
I concur only because I cannot find legal justification to dissent. The record clearly indicates J&J Ranch, Inc., was having financial diffi-

culties. The First National Bank of Springfield, while attempting to recoup at least part of the funds it loaned J&J Ranch, Inc., took over the mortgaged property. This action allowed Equitable to avoid foreclosing on the mortgage and most likely kept both the bank and Equitable from dealing with bankruptcy proceedings. Equitable would not have received the prepayment penalty if either foreclosure or bankruptcy had been involved. Only legal technicalities allowed the prepayment penalty. Equitable did not do equity.