**In re AE HOTEL VENTURE, Debtor.**

**No. 04 B 19764.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 16, 2005.

Douglas S. Draper, Constant G. Marquer, III, Deborah Weisler Fallis, Leslie A. Collins, Heller, Draper, Hayden, Patrick & Horn, LLC, New Orleans, LA; Karen R. Goodman, Shefsky & Froelich, Chicago, IL, for AE Hotel Venture.

John .Robert Weiss, Bryan E. Minier, Katten Muchin Zavis Rosenman, Chicago, IL, for GMAC Commercial Mortgage Corp.

## MEMORANDUM OPINION

A. BENJAMIN GOLDGAR,
Bankruptcy Judge.

■ This chapter 11 case involving debtor AE Hotel Venture ("AE Hotel") is before the court on the motion of GMAC Commercial Mortgage Corporation ("GMACCM") to determine the value of its secured claim.[1]

AE Hotel ran a suburban Chicago hotel which it acquired with a $7.6 million loan currently held by a securitization trust. AE Hotel eventually defaulted on the loan and was forced to seek relief under chapter 11 of the Bankruptcy Code. Shortly after the bankruptcy began, the hotel property was sold. Meanwhile, as special servicer for the trustee of the securitization trust GMACCM filed a secured proof of claim in the bankruptcy, and GMACCM now asks the court to determine the value of its claim.[2] In addition to principal and pre-default interest, GMACCM maintains that under the loan documents and under sections 506(a) and (b) of the Code it is entitled to a late charge, default interest, and a prepayment premium. AE Hotel does not contest GMACCM's right to the late charge but does object to default interest and the prepayment premium.

The matter is fully briefed and ready for ruling. For the reasons discussed below, GMACCM's motion is granted in part and denied in part. GMACCM is entitled to the prepayment premium. Its request for default interest, however, is denied.

### 1. Jurisdiction

■ The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(K). The court accordingly may enter a final judgment. *In re Smith,* 848 F.2d 813, 816 (7th Cir.1988).

### 2. Findings of Fact

No facts are in dispute, and no party has sought an evidentiary hearing. The facts recited in the parties' papers are as follows.

From 1997 until recently, AE Hotel, an Illinois joint venture, owned and operated a Hawthorne Suites Hotel in Lincolnshire, Illinois. In May 1997, AE Hotel and LaSalle National Bank ("LaSalle"), as trustee

---

1. Although GMACCM styles its motion as a "motion for allowance of claim and to compel payment thereof," GMACCM's motion is really a motion under Bankruptcy Rule 3012. Fed. R. Bankr.P. 3012. A motion to "allow" a filed claim is unnecessary, since a claim is deemed allowed under section 502(a) when proof of the claim is filed, unless some party in interest objects. 11 U.S.C. § 502(a). GMACCM's claim was deemed allowed when it was filed. No party has objected to the claim.

2. The claim belongs to the securitization trust, of course, not to GMACCM. GMACCM is acting on behalf of the trustee. For the sake of brevity, however, this opinion will discuss the claim as if it belonged to GMACCM.

of a land trust, borrowed $7.6 million, apparently to acquire the hotel property. The loan was evidenced by a note (the "Note") with a maturity date of June 1, 2007 and an interest rate of 9.72%. AE Hotel and LaSalle granted a mortgage on the property, executing a mortgage, security agreement, and assignment of rents (the "Mortgage"). The Mortgage accorded the lender a first priority lien on the property and its proceeds.

The loan was subsequently "securitized." That is, the loan was pooled with other loans, and securities consisting of interests in the pool were sold to public investors who were promised a fixed rate of return. *See F.D.I.C. v. Ernst & Young LLP*, 374 F.3d 579, 580 (7th Cir.2004) (explaining securitization). The Mortgage and certain other documents were assigned to LaSalle as trustee for the particular series of mortgage-backed pass-through certificates—the "securitization trust."[3] LaSalle delegated authority to act on its behalf to GMACCM as special servicer of the trust.

The Mortgage defines what constitutes an "event of default" under the loan documents. One of these, not surprisingly, is a failure to pay any portion of the debt within five days of the date the payment is due. The Note and Mortgage also contain terms specifying certain added charges AE Hotel will incur in the event of either a late payment or other default. Three of these charges are relevant here.

● First, paragraph 8 of the Note and section 23 of the Mortgage provide for a late payment charge if a payment is made more than five days after the due date. The charge consists of 5% of the unpaid balance or the maximum legally permissible amount, whichever is less. The purpose of this charge, according to the loan documents, is "to defray the expense incurred" in "handling and processing such delinquent payment and to compensate Mortgagee for the loss of the use of such delinquent payment."

● Second, paragraph 6 of the Note and section 21 of the Mortgage impose a new and higher "default rate" of interest following either an event of default or a failure to pay the debt in full on the maturity date. Under these provisions, interest on the unpaid principal balance of the Note accrues at 14.72% following a default, a 5% increase over the Note's original 9.72% interest rate.

● Third, paragraph 5 of the Note and section 24 of the Mortgage provide for a prepayment premium if a prepayment occurs after an event of default.[4] Paragraph 5 of the Note states that if after an event of default and "at any time prior to a sale of the Mortgaged Property ... either through foreclosure or the exercise of the other remedies available to the Payee," AE Hotel pays an amount sufficient to satisfy the debt under the Note, that payment will be deemed "a voluntary prepayment," and AE Hotel will be obligated to pay an additional "prepayment consideration." Section 24 of the Mortgage is in all relevant respects identical.

Paragraph 4 of the Note sets out the formula for calculating any prepayment premium. Translated roughly into English, the Note says that the prepayment premium will be the larger of two numbers. The first number is the difference

---

3. GMACCM asserts that AE Hotel's payments on the Note were used to pay the principal and interest promised to investors who purchased securities issued by the securitization trust.

4. Paragraph 4 of the Note provides for a prepayment premium if a prepayment occurs *before* an event of default. GMACCM does not contend there was a prepayment before an event of default.

between (a) the principal the borrower is repaying, and (b) the amount of remaining principal and interest on the date of the prepayment, discounted to present value at a discount rate equal to the yield of certain U.S. Treasury securities—securities with maturity dates resembling the maturity date of the loan—during the week before the prepayment.[5] The second number is 1% of the outstanding principal on the prepayment date.

According to GMACCM, the first number, which necessarily varies with the interest rates on the government securities and may be as low as zero, is designed to capture the actual loss the trust suffers when a loan is prepaid. The prepayment premium, GMACCM says, thus provides a "precise method" of determining the trust's losses and so is always "an exact calculation of the damage" resulting from a prepayment. AE Hotel has not contested as a factual matter GMACCM's description of the prepayment premium formula or the formula's effect in compensating for losses resulting from a prepayment. The court therefore takes GMACCM's assertions to be true.[6]

Six and a half years after the loan was made, AE Hotel defaulted. On December 1, 2003, AE Hotel stopped making payments due under the Note, an "event of default." GMACCM accelerated the debt, declaring the entire amount due. On May 17, 2004, GMACCM filed an action in Illinois state court to foreclose on the property and to have a receiver appointed. Three days later, on May 20, 2004, AE Hotel sought bankruptcy protection, filing a petition for relief under chapter 11. The obvious purpose of the bankruptcy was to gain time to sell the hotel property and other assets of the estate. To that end, in July 2004 AE Hotel sought and received permission from the court to sell the property. The hotel property was ultimately sold at public auction on August 30, 2004 for $7.8 million. The court entered an order approving the sale the next day.

In the interim, on July 21, 2004, GMACCM had filed a proof of its claim in the bankruptcy. The claim, all of which purports to be secured, has four elements: (1) principal and pre-petition interest, (2) post-petition interest, (3) attorneys' fees, a late charge, and other fees and expenses, and (4) a prepayment premium.[7] On Sep-

---

**5.** Specifically, the Note defines the "Discount Rate" as one that, "when compounded monthly, is equivalent to the 'Treasury Rate' when compounded semiannually." "Treasury Rate," in turn, is defined as "the yield calculated by the linear interpolation of the yields .... of U.S. Treasury constant maturities with maturity dates (one longer and one shorter) most nearly approximating" the maturity date of the loan.

**6.** Whether the prepayment premium formula here really compensates precisely for losses might be questioned. *See* G. Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment*, 28 Real Estate L.J. 202, 203 (2000) (stating that a formula of this sort "overcompensates the lender"); *see also In re Hidden Lake Ltd. P'ship*, 247 B.R. 722, 729 (Bankr.S.D.Ohio 2000) (noting that a similar formula overcom-

pensated lender but finding prepayment charge reasonable). But since AE Hotel has not questioned whether the formula really does what GMACCM claims, the court sees no reason to question it.

**7.** Specifically, the proof of claim asserts a right to payment of the following: $6,794,604.14 in principal; $310,037.77 in interest accrued from December 1, 2003 to May 19, 2004; $17,251.35 in late charges; $121,736.66 in default interest accrued from January 11, 2004 through May 19, 2004; $826.00 representing miscellaneous fees; and $1,248,290.91 as a prepayment premium. These amounts total $8,492,746.83. The proof of claim also asserts a right to interest accruing post-petition at a rate of $2,778.34 per day. The total amount of the claim as of July 19, 2004 was $8,662,219.34. Apart from the $121,736.66, it is unclear from the proof

tember 4, 2004, GMACCM filed a motion for "allowance" of its claim. AE Hotel opposed the motion, objecting to GMACCM's requests for default interest and for the prepayment premium. AE Hotel has not objected to any other element of the claim and has not disputed any of the dollar amounts of those elements.

### 3. Conclusions of Law

#### a. Default Interest

■ GMACCM is not entitled to post-petition default interest. The claim for default interest is not a claim for interest at all, as GMACCM postures it, but rather a claim for a charge. GMACCM has not demonstrated that the charge is "reasonable," as section 506(b) requires.

Under section 506(b) of the Code, a creditor with an oversecured claim—and AE Hotel concedes that GMACCM's claim is oversecured—is entitled to receive "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). As section 506(b) requires, GMACCM will receive interest post-petition at the Note's *original* contract rate of 9.72%. AE Hotel has not objected to that portion of GMACCM's claim, and the claim for post-petition interest at 9.72% is thus allowed. 11 U.S.C. § 502(a).

■ GMACCM's claim for *default* interest—the additional 5% interest that began accruing upon AE Hotel's default—is another matter. Generally speaking, interest compensates for the delay in receiving money owed: "the loss of the time value of money." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992); *see also Art Press Ltd. v. Western Printing Mach. Co.*, 852 F.2d 276, 278 (7th Cir.1988). GMACCM arrived at the interest rate it believed would compensate for that loss in the Note: a rate of 9.72%. That being so, the difference between the original rate and the 14.72% default rate—a difference of 5%—could not have been meant to perform the usual function of interest. The time value of GMACCM's money, after all, did not magically increase by 5% once AE Hotel defaulted.[8]

■ Default interest is instead designed to reimburse creditors for "extra costs incurred after default." *In re Consol. Props. Ltd. P'ship*, 152 B.R. 452, 455 (Bankr.D.Md.1993); *see also In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr.S.D.N.Y. 1998). Default interest, then, is not true interest at all. It is a form of late charge and thus is a "charge" for purposes of section 506(b). *See Fischer Enters., Inc. v. Geremia (In re Kalian)*, 178 B.R. 308, 316–17 (Bankr.D.R.I.1995) (deeming default interest to be a "charge"); *see also Consol. Props.*, 152 B.R. at 455 (noting

---

of claim and from the parties' papers whether the interest amounts GMACCM is claiming consist of default interest or interest at some other rate.

**8.** Although interest is also sometimes charged to compensate for the risk of non-payment, *see Till v. SCS Credit Corp.*, 541 U.S. 465, ——, 124 S.Ct. 1951, 1961–62, 158 L.Ed.2d 787 (2004), default interest sought under section 506(b) performs no such function. Because a creditor claiming default interest under section 506(b) is oversecured, the creditor will be paid in full. Arguably, in fact, default interest *never* compensates for any risk of nonpayment. A "risk" is the possibility of experiencing some harm or loss. *American Heritage Dictionary* 1557 (3rd ed.1992). Once the harm comes about, however, there is no longer any "risk" of it. When a default interest rate comes into effect, there has already been non-payment. Indeed, non-payment is what makes the rate effective in the first place. At that point, non-payment is not a "risk"; it is a reality.

that default interest is "more in the nature" of a charge); *but see* 4 A. Resnick & H. Sommer, *Collier on Bankruptcy* ¶ 506.04[2][b][ii] at 506–112 (15th rev. ed.2004) (stating that "[i]n general, a default rate of interest is properly a form of interest").

▇▇▇▇ Because GMACCM's default interest is actually a charge, it must be "reasonable" to be allowed. 11 U.S.C. § 506(b); *see Consol. Props.*, 152 B.R. at 456. A creditor is entitled to post-petition "fees, costs, or charges" under section 506(b) "only if they are reasonable and provided for in the agreement under which the claim arose." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026. Default interest is not a "reasonable" charge, however, if it compensates for an injury that has already been compensated in some other way under the parties' agreement. *See In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 305 (Bankr.D.Mass.1997); *Consol. Props.*, 152 B.R. at 458.

Several courts have held that when a creditor will be paid late charges, the creditor cannot also claim default interest under section 506(b) because payment of both would amount to a double recovery. "[O]versecured creditors," the court said in *Vest Assocs.*, "may receive payment of either default interest or late charges, but not both." *Vest Assocs.*, 217 B.R. at 701; *see, e.g., Kalian*, 178 B.R. at 312 n. 9, 316 n. 18 (considering reasonableness of claim for default interest only after creditor waived claim to late charges); *Consol. Props.*, 152 B.R. at 458–59 (allowing claim for late charge provided claim was not combined with a claim for default interest); *1095 Commonwealth Ave.*, 204 B.R. at 304–05 (allowing default interest but not late charges because both were intended to compensate lender for the same loss).

The court of appeals for this circuit, moreover, appears to endorse this view.

*See In re Terry Ltd. P'ship*, 27 F.3d 241, 243–44 (7th Cir.1994). In *Terry*, the court upheld a claim for default interest under section 506(b). In doing so, the court enforced the contract and declared that creditors "have a right to bargained-for post-petition interest," a right bankruptcy courts should be reluctant to disturb. *Id.* at 243. The court added, however, that the contract rate is only presumptive and is "subject to rebuttal based on equitable considerations." *Id.* One such equitable consideration, the court said, arises when a creditor is "entitled to late fees" and an additional award of default interest would "in effect [enable] the creditor to recover twice for the same losses." *Id.* at 244 (discussing *Consol. Props.* with approval).

GMACCM's claim raises the spectre of this double recovery. GMACCM has not waived its right to a late charge as some creditors do, *see Kalian*, 178 B.R. at 312 n. 9, but has included the late charge in its secured claim. AE Hotel has not objected to the late charge portion of GMACCM's claim, and so the late charge will be added to the claim. It may be that the late charge, now part of the claim, adequately compensates GMACCM for the added costs from AE Hotel's default. If so, GMACCM cannot also receive default interest. *Terry*, 27 F.3d at 243–44; *Kalian*, 178 B.R. at 312 n. 9, 316 n. 18; *Consol. Props.*, 152 B.R. at 458–59. On the other hand, it may be that GMACCM's late charge is insufficient to perform that task. If so, GMACCM would be entitled to some or even all of its default interest.

But GMACCM has not shown that it is entitled to all or even any default interest in this case. Because GMACCM has treated its request for default interest as a request for interest under section 506(b) rather than for a charge that must be "reasonable," it has supplied no evidence at all demonstrating that default interest

would compensate it for some loss the late charge does not. Without that evidence—evidence establishing default interest to be a "reasonable" charge—GMACCM is not entitled to default interest as part of its secured claim. GMACCM's request for default interest is therefore denied.

### b. Prepayment Premium

On the other hand, GMACCM is entitled to its prepayment premium. Although disputes over prepayment premiums can be complex and the case law is murky, the dispute here is simple. This is so because the facts are uncontested and because AE Hotel offers only token opposition to the prepayment premium GMACCM seeks.

 For an oversecured creditor like GMACCM to receive a prepayment premium as a "reasonable" post-petition charge under section 506(b), the premium must pass a two-part test. *See Noonan v. Fremont Fin. (In re Lappin Elec. Co.)*, 245 B.R. 326, 329 (Bankr.E.D.Wis.2000); *In re 433 S. Beverly Dr.*, 117 B.R. 563, 568–69 (Bankr.C.D.Cal.1990). First, the prepayment premium must be enforceable under state law.[9] *Lappin*, 245 B.R. at 329; *Ferrari v. Barclays Am./Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 87 B.R. 745, 748–

50 (Bankr.D.Mass.1988). Second, the prepayment premium must satisfy section 506(b): the charge must be one "provided for under the agreement," and it must be "reasonable." 11 U.S.C. § 506(b). Whether a charge is "reasonable" is, of course, a question of federal law. *In re Schwegmann Giant Supermarkets P'ship*, 264 B.R. 823, 827 (Bankr.E.D.La.2001), *aff'd*, 287 B.R. 649 (E.D.La.2002); *In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 424 (Bankr.S.D.Ohio 1993); *433 S. Beverly*, 117 B.R. at 569.

In this case, AE Hotel argues only (1) that the prepayment premium is not a charge "provided for under the agreement," at least not in the circumstances of this case; and (2) that the prepayment premium is unenforceable under state law. Assuming those two elements are met, AE Hotel does not contend the prepayment premium is other than "reasonable" for purposes of section 506(b).[10]

Both elements are met here.

### (1) "Provided for Under the Agreement"

 The prepayment premium is a charge "provided for under the agree-

---

**9.** The state law inquiry is not necessary because section 506(b) requires it, as some courts seem to assume. *Compare In re Kroh Bros. Dev. Co.*, 88 B.R. 997, 999 (Bankr. W.D.Mo.1988) (appearing to adopt this view), *with In re A.J. Lane & Co.*, 113 B.R. 821, 825 (Bankr.D.Mass.1990) (rejecting *Kroh Bros.* and "those decisions which have applied both federal *and* state law to prepayment charges") (emphasis in original). Rather, it is necessary because a secured creditor has no rights to evaluate under section 506(b) unless state law provides them. *433 S. Beverly*, 117 B.R. at 568; *In re Skyler Ridge*, 80 B.R. 500, 503 (Bankr.C.D.Cal.1987).

**10.** It is therefore unnecessary to delve into the difficult question of what it means for a prepayment premium to be a "reasonable" charge. Although the case law is muddled, bankruptcy courts appear to have adopted

two different approaches. Most courts require that a prepayment premium reflect the actual damage the lender suffered from the prepayment. *See, e.g., Sachs Elec. Co. v. Bridge Info. Sys., Inc. (In re Bridge Info. Sys., Inc.)*, 288 B.R. 556, 564 (Bankr.E.D.Mo. 2002); *Schwegmann*, 264 B.R. at 828; *Outdoor Sports*, 161 B.R. at 424; *433 S. Beverly*, 117 B.R. at 569. In addition, these courts often (though not always) examine the equities of awarding the premium. *See, e.g., Schwegmann*, 264 B.R. at 831–32. A minority of courts evaluate prepayment premiums as liquidated damage clauses. *See, e.g., A.J. Lane*, 113 B.R. at 827–28; *Connecticut Gen. Life Ins. Co. v. Schaumburg Hotel Owner Ltd. P'ship (In re Schaumburg Hotel Owner Ltd. P'ship)*, 97 B.R. 943, 953–54 (Bankr.N.D.Ill. 1989).

ment," namely the Note that AE Hotel gave to GMACCM.[11] Paragraph 4 of the Note specifically states that the principal balance "may be prepaid in whole (but not in part) on thirty days written notice," provided there has been no event of default and on payment of the prepayment premium that is the subject of this dispute. Paragraph 5 likewise provides for prepayment after an event of default. None of this is too surprising: had paragraphs 4 and 5 of the Note not permitted prepayment, there would have been little reason for the Note's elaborately calculated prepayment premium.

Sensibly, AE Hotel does not deny that the Note provides for prepayment. AE Hotel contends, rather, that there could be no prepayment once GMACCM accelerated the debt after the Hotel's default. By accelerating, AE Hotel says, GMACCM waived its right to the prepayment premium.

 AE Hotel is mistaken. It is true that a lender typically "loses its right to a premium when it elects to accelerate the debt." *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir.1984); *see also Slevin Container Corp. v. Provident Fed. Savs. & Loan Ass'n of Peoria*, 98 Ill.App.3d 646, 648, 54 Ill.Dec. 189, 424 N.E.2d 939, 940–41 (3rd Dist.1981). The reason, as the court in *LHD Realty* explained, is that acceleration "advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity." *LHD*, 726 F.2d at 331; *see also Slevin*, 98 Ill.App.3d at 648,

54 Ill.Dec. 189, 424 N.E.2d at 941. By accelerating the debt, the lender signals that it "prefers accelerated payment to the opportunity to earn interest over a period of years" and so waives interest in the form of a prepayment premium. *LHD*, 726 F.2d at 331.

 But that consequence is not inevitable. *LHD* suggests that the usual effect of acceleration on the enforceability of prepayment premiums can "be modified by the parties through appropriate contractual provisions." *Id.* at 331 n. 5. Parties to loan agreements may therefore agree that prepayment premiums are due even after acceleration. *See, e.g., Parker Plaza W. Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349, 353–56 (5th Cir. 1991) (finding provision did not violate public policy); *Financial Ctr. Assocs. v. The Funding Corp. (In re Fin. Ctr. Assocs.)*, 140 B.R. 829, 834–35 (Bankr. E.D.N.Y.1992) (rejecting argument that acceleration waived prepayment charge where agreement provided for charge after acceleration); *Schaumburg Hotel*, 97 B.R. at 953 (Bankr.N.D.Ill.1989) (same).

And, in fact, GMACCM and AE Hotel did just that in the loan documents here. Paragraph 5 of the Note declares that if, after an event of default, "[AE Hotel] shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property ..., either through foreclosure or the exercise of the other remedies available to [GMACCM] under the Mortgage, such tender by [AE Hotel] shall be deemed to be a voluntary

---

11. Because possession of a state law right is a prerequisite to consideration of the right's reasonableness under section 506(b), most courts first consider the prepayment premium's enforceability under state law. *See, e.g., Lappin*, 245 B.R. at 329; *433 S. Beverly*, 117 B.R. at 568; *Skyler Ridge*, 80 B.R. at 503–04; *but see Schwegmann*, 264 B.R. at 828 (declining to consider validity under state law be-

cause premium was unreasonable under section 506(b)). Unless the agreement provides for a prepayment premium, however, there is no state law right to enforce. In cases like this one where the content of the agreement is disputed, then, the first step must be to answer the section 506(b) question whether the charge is "provided for under the agreement." 11 U.S.C. § 506(b).

prepayment." Section 24 of the Mortgage is virtually the same. Such a prepayment, both provisions continue, will require payment of the "prepayment consideration" described in the Note.

▄▄▄ Although these provisions do not mention "acceleration" directly as the provision in *Schaumburg Hotel* did, they make acceleration equally irrelevant. Under paragraph 5 and section 24, a payment of the debt even after default is a "voluntary prepayment" as long as the payment occurs before a foreclosure sale or some other sale resulting from GMACCM's remedies under the Mortgage. There was no such sale here: AE Hotel's bankruptcy filing brought the foreclosure to a halt and precluded any other sale at GMACCM's instance. In August 2004, AE Hotel held a court-sanctioned auction sale of the property and tendered payment of the debt. Because the August payment occurred before any GMACCM-prompted sale under the Mortgage, the payment was a "prepayment," notwithstanding GMACCM's earlier acceleration of the debt. At that point, the prepayment premium was due.

AE Hotel insists, though, that paragraph 5 and section 24 do not "expand" GMACCM's rights this far. AE Hotel notes that these provisions require the payment to be made "prior to a sale of the Mortgaged Property." Since the property was sold in August 2004, AE Hotel asserts, the payment was necessarily made after the sale, not "prior to" it.

The obvious problem with this interpretation is that it pulls up short, ignoring the remainder of paragraph 5 and section 24. Paragraph 5 refers to payment "prior to a sale of the Mortgaged Property ... *either through foreclosure or the exercise of the other remedies available to Payee under the Mortgage.*" Section 24 is similar. These provisions, then, do not describe just any sale, let alone a sale by AE Hotel.

They describe a sale resulting from GMACCM's use of its remedies under the Mortgage. Only if payment came after a sale of that kind would the payment not trigger the premium. In matters of contract interpretation, it generally pays to read to the end of the sentence. *See Miniat v. Ed Miniat, Inc.*, 315 F.3d 712, 715 (7th Cir.2002) (noting that under Illinois law all contract terms must be given effect); *In re Marriage of Wenc*, 294 Ill. App.3d 239, 247, 228 Ill.Dec. 552, 689 N.E.2d 424, 429 (2nd Dist.1998) (declaring that Illinois courts will not assume parties inserted "key contractual language for no reason at all").

Because the loan documents here expressly provide for a prepayment premium even when the debt is accelerated, the premium is "provided for under the agreement."

### (2) Enforceable Under State Law

▄▄▄ The prepayment premium is also enforceable under state law. *LHD* declares as a general matter that "reasonable prepayment premiums are enforceable." *LHD*, 726 F.2d at 330; *see also Automotive Fin. Corp. v. Ridge Chrysler Plymouth L.L.C.*, 219 F.Supp.2d 945, 949 (N.D.Ill.2002). The smattering of Illinois case law on the subject seems to agree. *See First Nat'l Bank v. Equitable Life Assurance Soc'y*, 157 Ill.App.3d 408, 414, 109 Ill.Dec. 650, 510 N.E.2d 518, 523 (4th Dist.1987) ("Whether characterized as a 'fee,' 'premium,' or 'penalty' for prepayment of a loan, such provisions have been routinely upheld and enforced where the mortgagor's election to call the loan to maturity was voluntary."); *see also Village of Rosemont v. Maywood–Proviso State Bank*, 149 Ill.App.3d 1087, 1091, 103 Ill. Dec. 542, 501 N.E.2d 859, 861–62 (1st Dist. 1986) (assuming enforceability); *Slevin*, 98 Ill.App.3d at 647, 54 Ill.Dec. 189, 424 N.E.2d at 940 (same). Certainly, no Illi-

nois decision says prepayment premiums are per se *un*enforceable.

 Enforceability depends on whether the premium is meant to liquidate damages or impose a penalty. *Ridge*, 219 F.Supp.2d at 949–50; *Schaumburg*, 97 B.R. at 953. A liquidated damages clause will be enforced; a penalty will not.[12] *Saunders v. Michigan Ave. Nat'l Bank*, 278 Ill.App.3d 307, 314, 214 Ill.Dec. 1036, 662 N.E.2d 602, 609 (1st Dist.1996). For the clause to be upheld, (1) the parties must have intended to agree in advance on damages from a breach, (2) the amount must have been reasonable as of the time of contracting, bearing some relation to the damage that might be sustained, and (3) the amount of actual damages must be uncertain and difficult to prove. *Jameson*, 351 Ill.App.3d at 423, 286 Ill.Dec. 431, 813 N.E.2d at 1130; *Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger*, 311 Ill. App.3d 853, 860, 244 Ill.Dec. 712, 726 N.E.2d 687, 693 (2nd Dist.2000). The burden of proving that the clause imposes a penalty rests with the party resisting its enforcement. *XCO*, 369 F.3d at 1003.

AE Hotel has not met its burden here. AE Hotel does not deny the prepayment premium was an attempt by the parties to liquidate damages in case of a prepayment. Nor does AE Hotel deny that the actual damages from a prepayment of its loan were uncertain or difficult to prove. As for the reasonableness of the damages, there is little to discuss. AE Hotel has not disputed that the formula for the premium precisely determines the securitization trust's losses, so that the premium always corresponds perfectly to the damages from a prepayment. An *exact* relation to actual damages more than satisfies the need for "some relation." If a liquidated damages clause calculates the damages to match the actual loss in every case, it is hard to see what makes the provision a penalty.[13]

AE Hotel nevertheless claims the prepayment premium is indeed a penalty. In support, AE Hotel notes that the $1.2 million premium is quite large, amounting to more than 18% of the loan balance.

 The relevant question under Illinois law, however, is not the size of the

**12.** A contractual provision that sets "unreasonably large liquidated damages" is said to be unenforceable as "violating public policy." *Saunders*, 278 Ill.App.3d at 314, 214 Ill.Dec. 1036, 662 N.E.2d at 609. Whether there is any sense to this policy, especially when the parties to the contract are sophisticated business entities, is a good question. *See XCO Int'l Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001–03 (7th Cir.2004) (terming the rule's continued existence "one of the abiding mysteries of the common law"); *see also Jameson Realty Group v. Kostiner*, 351 Ill. App.3d 416, 423, 286 Ill.Dec. 431, 813 N.E.2d 1124, 1130 (1st Dist.2004) (noting that "the public policy behind this rule has never been explained clearly").

**13.** In its motion and memoranda, GMACCM makes a great deal out of the fact that the loan to AE Hotel was later securitized. Not only did securitization render the income stream from the loan payments essential (because without it the trust would be forced to look elsewhere for income to pay its investors), but according to GMACCM an unidentified provision of the Internal Revenue Code restricts the trust's reinvestment of prepaid funds to low-yield U.S. Treasury securities.

Although AE Hotel's concession that the prepayment premium compensated GMACCM for its loss pretty well ends the liquidated damages inquiry, it is nevertheless hard to see what relevance the securitization could have to the premium's validity as a liquidated damages clause. The loan to AE Hotel and the later securitization of that loan were separate transactions. The securitization had nothing to do with AE Hotel, and the loan documents did not notify AE Hotel that the loan might be securitized. It is beside the point in determining what actual damages resulted from the prepayment that GMACCM later decided to make a deal with someone else limiting its reinvestment options and so increasing its potential losses from a prepayment.

liquidated damages amount standing alone. The question is the *relation* between that amount and the projected actual loss. *Jameson,* 351 Ill.App.3d at 423, 286 Ill.Dec. 431, 813 N.E.2d at 1130. The operative principle in evaluating liquidated damages provisions is "the principle of compensation." Restatement (Second) of Contracts § 356 cmt. a (1981). Accordingly, it makes no difference how much the liquidated damages amount itself is—or for that matter how much the actual loss itself turns out to be—as long as the liquidated damages in the contract were a reasonable forecast of, and bore some relation to, the loss. Again, AE Hotel concedes (by not disputing) that they were an *exact* forecast here.

Despite that concession, AE Hotel next claims GMACCM in fact has no loss to be compensated. That is so, AE Hotel asserts without much explanation, because GMACCM received more than the value of the property from the sale, and because GMACCM was unable to re-lend the prepaid funds.

AE Hotel's acceleration argument was its Maginot Line; these arguments appear to be afterthoughts. That GMACCM received more from the sale than the value of its security says nothing about whether GMACCM had a loss. GMACCM made the loan, not to gain the benefits from some eventual sale of the property, but to obtain the income stream from AE Hotel's loan payments. The loan documents contemplated payments; they did not contemplate a sale. GMACCM's loss is therefore the loss of the income stream. AE Hotel has not attempted to show that GMACCM received as much from the sale of the property as it would have received had all the loan payments been made. As for GMACCM's asserted inability to re-lend the prepaid funds, the argument that this restriction meant GMACCM had no loss is an obvious non sequitur. Far from showing GMACCM had *no* loss, proof that GMACCM could not re-lend the funds would tend to establish its loss.[14]

Because AE Hotel has not sustained its burden of showing the prepayment premium imposes an illegal penalty, *XCO,* 369 F.3d at 1003, the court concludes the prepayment premium was a valid liquidated damages clause enforceable under Illinois law.

### 4. Conclusion

The motion of GMAC Commercial Mortgage Corporation for allowance of claim and to compel payment, construed as a motion for the valuation of a secured claim, is granted in part and denied in part. The request for default interest is denied. The request for the prepayment premium is granted. A separate Rule 9021 judgment will be entered in accordance with this opinion.

14. AE Hotel adds as a strand of its "no loss" argument that GMACCM had already accelerated the debt and so had elected to forego interest it would have earned on future loan payments. The acceleration argument has been addressed. (*See* discussion *supra.*). AE Hotel also complains that GMACCM has not produced the certificates held by the investors in the trust and so has not shown that the investors were in fact "guaranteed any rate of return." What this has to do with the fact or amount of GMACCM's loss from AE Hotel's prepayment, or the reasonableness of the prepayment premium itself, is hard to fathom. As with its other "no loss" assertions, AE Hotel fails to elaborate.