**In re BRANDYWINE TOWNHOUSES, INC., Debtor.**

**Brandywine Townhouses, Inc., Movant,**

v.

**Federal National Mortgage Association, d/b/a Fannie Mae, Respondent.**

**No. 13–75582–BEM.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed Aug. 19, 2014.

Rodney L. Eason, The Eason Law Firm, College Park, GA, for Debtor.

David S. Weidenbaum, Office of the U.S. Trustee, Atlanta, GA, for U.S. Trustee.

## *ORDER*

BARBARA ELLIS–MONRO, Bankruptcy Judge.

This Chapter 11 case came before the Court for a hearing on April 30, 2014, (the "Hearing") on Debtor's Objection to Proof of Claim Filed by Fannie Mae [Proof of Claim No. 2] (the "Objection"), [Doc. No. 49], and Fannie Mae's Response to Debtor's Objection to Proof of Claim (the "Response"). [Doc. No. 65]. In the Objection, Debtor seeks to disallow Fannie Mae's claim based on allegations that: (i) there was no default under the agreements governing the parties' relationship; (ii) Fannie Mae did not allow the Debtor to cure a default, if there was one; (iii) the prepayment penalty included in Fannie Mae's claim is unreasonable and was calculated incorrectly; (iv) default interest was calculated incorrectly; (v) late charges are incorrect; (vi) the attorney's fees are not reasonable; and (vii) there is no proof that Fannie Mae is oversecured. [Doc. No. 73].[1]   Fannie Mae responded and argues

---

1.  Debtor also seeks, to the extent necessary due to timing, an interim order estimating the Claim as secured to the extent of $2,700,000 because Fannie Mae had, in previous pleadings, valued Debtor's real property at $2,700,000.  Because this order resolves the

that the amounts set forth in its claim are correct and were calculated as provided in the agreements governing Debtor's obligations. Fannie Mae asserts further that its claim is fully secured. [Doc. No. 65].

After careful consideration of the pleadings of record, the evidence presented, applicable authorities and the argument of counsel, the Court now enters the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052 as applied in contested matters by Fed. R. Bankr.P. 9014.

## I. Findings of Fact

Debtor is a Georgia non-profit company which owns a low and moderate-income housing cooperative consisting of 238 apartments located at 85 Mt. Zion Rd., SW, Atlanta, Georgia 30054 (the "Property"). Debtor has been in operation for over forty years.

On or about August 10, 2007, Debtor obtained a loan in the original principal amount of $4,366,587.00 (the "Loan"), from Arbor Commercial Funding, LLC ("Arbor"). The Loan is evidenced by two Multifamily Notes dated August 10, 2007, in the amount of $3,850,000.00 and $516,587.00, respectively, executed by the Debtor, and payable to Arbor (the "Notes").[2] To secure repayment of the Notes, Debtor, as grantor, executed a Multifamily Deed to Secured Debt, and an Assignment of Rents and Security Agreement dated August 10, 2007, conveying title to the Property to Arbor, as grantee. (the "Security Deed" and with the Notes, the "Loan Documents"). The Security Deed was recorded on August 14, 2007, in

Deed Book 45537, Page 362, Fulton County, Georgia Records, and re-recorded on September 12, 2007 in Deed Book 45680, page 115, Fulton County, Georgia Records. Arbor also assigned the Security Deed and Notes to Fannie Mae on August 10, 2007. [R. Ex. B].[3] Arbor continued to service the Loan after assignment. Debtor was current on its payments under the Notes until September 2013.

On or about December 2010, Debtor became aware that its management company was not paying certain utility bills and that, as a result, Debtor owed a significant amount for delinquent water and sewer bills. In January 2011, Debtor hired a new management company, Alton Management ("Alton") and Debtor began making payments to reduce the balance owed on account of delinquent water and sewer bills.

In June 2013, Debtor met with the City of Atlanta Department of Watershed Management ("Watershed") in an effort to negotiate a payment plan for Debtor's past due water and sewer obligations. From that meeting, Debtor understood that it would have to make an initial payment of approximately $42,000 and the remaining balance due would be payable over a thirty-six (36) month period. In an effort to pursue this arrangement, Debtor requested that Arbor allow Debtor to draw $42,000 from certain funds held in reserve under the Loan Documents to make the initial payment to Watershed. Arbor advised that it would have to present the proposal to upper management. Debtor believed that once the $42,000 payment was made, Watershed would enter into a written agreement regarding payment of

---

Objection, it is not necessary to estimate Fannie Mae's claim.

**2.** The $516,587.00 Note has been paid in full. Only the $3,850,000.00 Note remains outstanding.

**3.** Debtor's exhibits will be referred to as [D. Ex. ——], Fannie Mae's exhibits will be referred to as [R. Ex. ——].

the past due amounts with Debtor. This arrangement was never consummated.

On August 8, 2013, Watershed issued a Final Disconnection Notice (the "Notice") to Debtor. [D. Ex 6; R. Ex 6]. The Notice provides that Debtor's water and sewer service would be disconnected on August 15, 2013, unless a portion of the total amount owed was paid. The partial payment was in the amount of $438,509.29. The Notice provides further that full payment of $480,772.45 was due by August 25, 2013. Debtor was unable to make a payment by August 15, 2013.

On August 16, Arbor advanced $42,263.126 to Watershed. This advance was made to "prevent disconnection of service." [R. Ex. F]. Following the advance, on August 26, 2013 Fannie Mae sent Debtor a Notice of Default, Demand and Acceleration (the "Demand Letter"). The Demand Letter informed Debtor that it was in default of its obligations under the Loan Documents because of Debtor's "failure to pay when due operating expenses of the Property" and because the past due balance owed to Watershed could constitute a lien against the Property. The Demand Letter also accelerated the debt and demanded payment in full of the same. [R. Ex. F; D. Ex. 7].

On or about September 9, 2013, Fannie Mae filed an *ex parte* complaint in the State Court of Fulton County seeking appointment of a receiver for the Property. [D. Ex. 8]. The State Court of Fulton County entered an Order on September 19, 2013, appointing a receiver. [D. Ex. 9]. On October 10, 2013, the receiver cured the outstanding water bill, making a payment of $423,408.93 to Watershed. Shortly thereafter, on November 25, 2013, (the "Petition Date") Debtor filed this case. [Doc. No. 1].

## A. The Claim

Fannie Mae filed a proof of claim, claim 2 on the claims register in the amount of $5,012,392.86. (the "Claim"). The Claim was filed as secured. A detailed itemization of the Claim amount was attached to the proof of claim filed and is as follows:

| ITEM | Amount |
|---|---|
| Unpaid Principal Balance | $3,556,917.89 |
| Accrued Interest—At 6.65% from 8/13/2013 to 11/25/2013 | $74,902.76 |
| Default Interest—At 4% from 8/13/2013 to 11/25/2013 | $33,197.90 |
| Late charges—For 09/13/2013, 10/13/2013, and 11/13/2013 | $3,707.34 |
| Prepayment Penalty—Per Paragraph 10 and Schedule A of the Note | $1,263,012.05 |
| Appraisal Cost | $4,500 |
| Physical needs assessment/Cost | $2,750 |
| Environmental Site Assessment/Cost | $2,750 |
| Broker Opinion of Value/Cost | $500 |
| City of Atlanta Watershed—Partial payment of outstanding bill, paid 08/19/2013 | $42,263.16 |
| Advance to Receiver to pay Water Bill—Balance of outstanding bill paid by Receiver on 10/11/2013 | $423,408.93 |
| Attorneys Fees | $19,765.00 |
| Attorney/Legal Costs | $2,766.14 |
| Suspense Balance | $–43,555.39 |
| Replacement Balance | $–20,079.55 |
| Insurance and Tax Escrow Balance | $–52,174.77 |
| Housing Assistance Program | $–151,119.30 |

| | |
|---|---|
| DS (Operating Deficit Reserve) | $–151,119.30 |
| TOTAL | **$5,012,392.86** |

## B. The Loan Documents

Several provisions in the Security Deed are relevant to the issues raised in the Objection and are set forth below:

### Section 12—Protection of Lender's Security

(a) If Borrower fails to perform any of its obligations under this Instrument .... then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including .... (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17.

(b) Any amounts disbursed by Lender under this Section 12, or under any other provision of this Instrument that treats such disbursement as being made under this Section 12, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the *"Default Rate,"* as defined in the Note.

### Section 15—Taxes; Operating Expenses

\*   \*   \*   \*   \*   \*

(b) Subject to the provisions of Section 15(c), Borrower shall pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c) As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Impositions becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

### Section 22—Events of Default.

The occurrence of any one or more of the following shall constitute and event of Default under this Instrument:

(a) Any failure by Borrower to pay or deposit any amount required by the Note, this instrument or any other Loan Document;

. . . .

(f) The commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lend-

er's interest in the Mortgaged Property;

(g) Any failure by Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required which continues for a period of 30 days after notice of such failure by Lender to Borrower, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document;

### Section 43—Acceleration; Remedies

At any time during the existence of an Event of Default, Lender at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale granted in this Instrument (and Borrower appoints Lender as Borrower's agent and attorney-in-fact to exercise such power of sale in the name and on behalf of Borrower) and any other remedies permitted by Georgia law or provided in this Instrument or in any other Loan Document.

[D. Ex. 2].

## II. Analysis

█ Section 502 of the Code provides that absent an objection from a party in interest a filed proof of claim is deemed allowed. 11 U.S.C. § 502(a). If an objection is filed, then the Court must determine the validity and amount of the claim. 11 U.S.C. § 502(b). Section 502(b) provides nine bases for disallowance, including, disallowance for claims that are "unen-

forceable against the debtor and property of the debtor, under ... applicable law ..." which is the only provision that could apply here. 11 U.S.C. § 502(b). The amount and validity of claims is determined by state law. *Travelers Casualty & Surety Co. of America, v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *Welzel v. Advocate Realty Investments, LLC (In re Welzel)*, 275 F.3d 1308, 1313 (11th Cir.2001); *See also, In re Ovetsky*, 100 B.R. 115 (Bankr.N.D.Ga.1989).

Section 506(b) provides that interest and reasonable fees and costs can become part of an oversecured creditor's secured claim to the extent of the collateral value with allowance of such claims being accomplished pursuant to § 502. *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *In re Welzel*, 275 F.3d 1308 (11th Cir.2008); *In re New Power*, 313 B.R. 496, 509–510 (Bankr. N.D.Ga.2004). In order to be included in the secured portion of a claim, fees, costs and charges are subject to a reasonableness standard whereas interest is not so limited. *Welzel* at 1314.

### A. Debtor Defaulted

█ Debtor first argues that it was not in default under the Loan Documents and, even if it was, Fannie Mae breached the Loan Documents because Fannie Mae did not allow Debtor to cure the alleged default. It is undisputed that Debtor did not pay its water bills on time and that Debtor was pursuing a possible payment plan with Watershed Management. It is further undisputed that Debtor asked Arbor to allow it to use reserves required by the Loan Documents and held by Arbor in an effort to make the payment necessary for Watershed to consider a payment arrangement. These negotiations did not result in a pay-

ment arrangement and Watershed Management sent the Notice stating that if the arrearage was not paid by August 15, 2013, service was subject to being disconnected.

Section 15(b) of the Security Deed requires "Borrower [to] pay the expenses of operating ... maintaining the Mortgaged Property (including ... utilities)". Section 22(a) provides in part that "... [a]ny failure by Borrower to pay or deposit any amount required by the Notes, ... or any other Loan Document" constitutes an Event of Default. Thus, the Court cannot agree with Debtor's argument that it was not in default because Section 15(b) expressly provides that timely payment of utilities is required and such failure to pay is an Event of Default pursuant to Section 22(a). Thus, Debtor has failed to establish that it was not in default under the Loan Documents.

Similarly, the Court cannot agree with Debtor's argument that Fannie Mae breached the Loan Documents by failing to provide Debtor time to cure. Section 22(g) of the Security Deed states:

> [A]ny failure of Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower, but no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document.

[D. Ex. 2, p. 30]. Thus, by the express terms of Section 22(g), no notice or grace period applies to failure to pay utilities because this is a requirement of Section 22(a), which is expressly excepted from defaults that require notice and a cure period. Fannie Mae argues, and the Court agrees, that the potential for damage to its collateral if water and sewer service were terminated constitutes a reasonable basis for Lender to believe that the failure to pay could result in harm to the Lender. Accordingly, the Court finds that Debtor was in default and there was no right to cure the default under the Loan Documents.

Notwithstanding, it is not clear, why Fannie Mae used August 13, 2013, as the default date for calculating the amounts due. The Court finds that August 15, 2013, is the "Default Date" as contemplated by the Loan Documents because the Notice provides that if a partial payment of the past due amounts is not made by that date then water and sewer will be disconnected. Section 22(g) does not provide a right to cure in this situation and the Debtor was in default as of August 15, 2013.

**B.  Prepayment Penalty**

The Claim includes a prepayment penalty in the amount of $1,263,102.05. Georgia law provides that a prepayment penalty must be "stipulated in the contract, [otherwise] there shall be no prepayment penalty." Ga.Code Ann. § 7–4–2(b)(2) (West). The Note does so provide at Paragraph 6 which states:

> [i]f an Event of Default has occurred and is continuing, the entire unpaid principal balance, any accrued interest, the prepayment premium payable under Paragraph 10, if any, and all other amounts payable under this Note and any other Loan Document shall at once become due and payable at the option of Lender, without any prior notice to Borrower. Lender may exercise this option

to accelerate regardless of any prior forbearance.

[D. Ex. 3, p. 3]. Paragraph 10 provides further that the prepayment penalty is due upon either voluntary or involuntary prepayment of the amount due[4] and states, in part: "(2) Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (i) all accrued interest and all other sums due Lender under this Note and the other Loan Documents, and (ii) the prepayment premium calculated pursuant to Schedule A." *Id.* at p. 6. Thus Debtor agreed to pay a prepayment penalty when the Loan Documents were executed.

■ Prepayment penalties are intended to protect the lender from any loss it may incur because of changing interest rates between the time of the prepayment and the maturity date of the loan. *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 1001 (9th Cir. BAP 1989). *See also, Curtis v. Pilgrim Health and Life Insurance Co. (In re Curtis)*, 83 B.R. 853 (Bankr.S.D.Ga. 1988) (holding that prepayment penalties are not usurious and thus allowed under Georgia law).

■ Debtor believes that the prepayment penalty is unreasonable because it requires a payment of approximately 36% of the principal balance due. At first glance this seems like an unreasonable amount, however, upon closer inspection, it is apparent that the prepayment penalty in fact approximates the potential loss to the lender from early payment. The formula used to calculate the prepayment penalty creates a multiplier that measures the difference between the interest amount the lender would have received had the Debtor not defaulted on the loan, and the profits the lender could have made had it invested the funds loaned elsewhere. This is accomplished by multiplication of the principal unpaid balance by the difference between the yield rate for a 7.625% United States Treasury Security due in November 2022, with the yield rate being determined as of the 25th business day prior to either the alleged default date or acceleration,[5] and the number of months remaining between the default date and June 2022. The prepayment penalty is not charged until the maturity of the Loan, rather it is only charged until June 2022.

Further, the prepayment penalty is consistent with the default interest rate. The maturity date of the Loan was September 2037 or twenty four years after the Debtor defaulted, while, the prepayment penalty is only in effect if there is a prepayment on the Loan prior to June, 2022. If the 36% premium payment is divided into that nine year period, the result indicates a charge of approximately 4% per year, which is equal to the default interest rate. The Court finds that the prepayment penalty required by the Loan Documents is reasonable. Notwithstanding, there is an issue with the calculation of the amount of the prepayment penalty included in the Claim.[6]

---

4. The issue here is the involuntary prepayment due because of the acceleration of the loan as a result of the default on the water utility bill.

5. The 25th business day prior to the Default Date of August 15, 2013 would be July 11, 2013. The yield rate on July 11, 2013, for a 7.625% United States Treasury Security due on November 2022 was 2.338%. Yield rates change daily, therefore the use of the incorrect default date could substantially affect the amounts due.

6. Because the loan was accelerated on the Default Date of August 15, 2013, there are 106 months between August of 2013 and the Maintenance Period End Date of June 30, 2022, not quite the full 9 years (108 months) stated at the Hearing as the number used to

Talbot, a representative of Arbor, testified regarding the calculation of the prepayment penalty included in the Claim. In accordance with the Notes, the prepayment penalty results from a calculation in which the principal being prepaid is multiplied by the difference between the interest rate on the note (6.65%) and the yield rate of 2.338%. This amount is then multiplied by a formula that creates a multiplier from the yield rate and the months remaining on the loan.[7] According to Fannie Mae, the amount of the prepayment penalty due is $1,263,012.05, however when asked to calculate the amount at the Hearing, Talbot could not produce a consistent answer. Thus, there is no evidence to establish that this is the correct amount due using the formula contained in Schedule A of the Loan Documents. Calculating the prepayment penalty using the correct default date and the correct yield rate results in a prepayment penalty of $1,211,359.96 and the prepayment penalty will be allowed to this extent.

### C. Default Interest

■ Debtor objects that the default interest charged is not calculated correctly. The Claim includes $33,197.90 in default interest accrued from August 13, 2013, to the Petition Date. Pursuant to the Loan Documents, once the Debtor is in default, Fannie Mae is entitled to default interest,[8]

in this case four percent (4%). *See* [D. Ex. 3, p. 3].

Georgia law provides that contracts governing repayment of amounts in excess of $250,000 may establish any rate of interest as well as any other charges to be paid by the borrower. O.C.G.A. § 7–4–2(a)(1)(B); *see In re Curtis,* 83 B.R. at 856–57. However, interest rates above five percent (5%) monthly or sixty percent (60%) annually are usurious and can subject a lender to criminal charges. O.C.G.A. § 7–4–18. The 10.654% annual default rate charged under the Note is not invalid under Georgia law, and Fannie Mae is entitled to default interest. The Court has held that the Default Date is August 15, 2013, so two (2) days of default interest will be disallowed thereby reducing the Claim by $638.32.

### D. Late Charges

■ Debtor further objects to the inclusion of late charges in the amount of $3,707.34 incurred in the three months prior to the filing of the petition. Paragraph 7 of the Note allows for a late charge "equal to 5 percent of such monthly installment or other amount due" to be charged in the event that any monthly installment due is not received on or before the 10th day of each month. [D. Ex. 3, p. 3]. Although the Note states that "[t]he late charge is payable in addition to, and not in

---

calculate the prepayment penalty. In addition, as mentioned *supra,* the 25th business day prior to the Default Date is July 11, 2013, and the appropriate yield rate is 2.338%.

**7.** The prepayment premium formula is

$$(principal\ balance)x(y-r)x\ \frac{1-(1+r)^{-n/12}}{r},$$

where $y$ equal to the interest rate on the note, $r$ is equal to the yield rate on the 7.625% U.S. Treasury Security due November 2002 for the Default Date, 2.338%, and $n$ is the number of months remaining between the default date and the Yield Maintenance Period End Date

of June 30, 2022, 106 months, as defined in the Loan Documents.

**8.** The Note defines "Default Rate" as "[a] rate equal to the lesser of 4 percentage points above the Interest Rate or the maximum interest rate which may be collected from Bor-

lieu of, any interest payable at the Default Rate," courts in this district have found that late charges coupled with default interest may amount to a double-recovery by the creditor and as such may be unreasonable. *In re Cliftondale Oaks, LLC,* 357 B.R. 883, 884 (Bankr.N.D.Ga.2006) (Drake, J.).

In *Cliftondale Oaks,* the Court held that late charges are "fees" or "charges" within the meaning of § 506(b) and allowance requires a finding that the charge is reasonable. The Court concluded further that late charges imposed in conjunction with default interest were not reasonable. *Id.* at 887. (citing *In re Consolidated Properties Partnership,* 152 B.R. 452, 458 (Bankr. D.Md.1993) (allowance of 5% on the entire principal balance, in addition to default rate interest not reasonable when payment would impact junior creditors); *In re 1095 Commonwealth Ave. Corp.,* 204 B.R. 284 (Bankr.D.Mass.1997) (denying request for late charge on top of default interest, notwithstanding the fact that the debtor was solvent); *In re Vest Assocs.,* 217 B.R. 696 (Bankr.S.D.N.Y.1998) (refusing to allow default interest and late charges, even in the event the debtor turned out to be solvent); *In re AE Hotel Venture,* 321 B.R. 209 (Bankr.N.D.Ill.2005); *In re Route One West Windsor LP,* 225 B.R. 76 (Bankr.D.N.J.1998) (secured creditor not entitled to default interest and late charges, notwithstanding the fact that the payment of the late charge would only impact the recovery of an "insider" creditor)).

This Court agrees with the rationale adopted in *Cliftondale Oaks* and holds that Fannie Mae's assessment of both late charges and default interest would result in a double recovery because Fannie Mae is already being compensated for increased administrative costs through default interest. Thus, allowance of late charges would be unreasonable and the late charges will be allowed as an unsecured claim. *See In re Welzel,* 275 F.3d 1308 (11th Cir.2001) (holding that fees otherwise allowable under § 502 cannot be disallowed as unreasonable but will be treated as unsecured).

**E. Fannie Mae Is Oversecured**

■ The Court finds further that Fannie Mae is oversecured. At the Hearing, Debtor sought to introduce a broker's price opinion ("BPO") as evidence that Fannie Mae had previously valued the property at $2,500,000 and was thus judicially estopped from arguing that the property had a higher value. Fannie Mae objected to admission of the BPO as hearsay. The individual who prepared the BPO was not in court and the objection was sustained. Accordingly, the only evidence of value of the property was the Fulton County Board of Assessors 2013 valuation, which valued the property at $8,330,000. [R. Ex. G]. The Debtor scheduled the value of the property at $6,790,000. [Doc. No. 38]. The Claim amount of $5,012,392.86 is less than either of these values and Fannie Mae is oversecured.

Default interest is allowed in accordance with the Loan Documents and state law and is thus allowed as part of Fannie Mae's secured claim. The other fees, charges and costs included in the Claim are provided for in the Loan Documents and Fannie Mae is oversecured, thus as long as the attorney's fees, charges and costs are reasonable they are allowed pursuant to § 506(b). Debtor objected to the amount of attorneys' fees included in the Claim, but withdrew that portion of the Objection at the Hearing. With the exception of the late charges, Debtor did not challenge the reasonableness of the other

rower under applicable law." [D. Ex. 3, p. 1].

costs and charges included in the Claim and those fees and costs are allowed. Accordingly, it is

IT IS HEREBY ORDERED that Debtor's Objection is SUSTAINED IN PART AND OVERRULED IN PART as provided herein;

IT IS FURTHER ORDERED that the Prepayment Penalty is reduced to $1,211,359.96, the amount of the default interest is reduced to $32,559.58;

IT IS FURTHER ORDERED that the late charges will be allowed as an unsecured claim;

IT IS FURTHER ORDERED that the Claim is an allowed secured claim in the amount of $4,956,395.11, and an unsecured claim in the amount of $3,707.34.